```
 1              UNITED STATES DISTRICT COURT

 2       CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

 3        HONORABLE CHRISTINA A. SNYDER, U.S. DISTRICT JUDGE

 4

 5  CATHERINE ALTAMURA, et al., on behalf  )
    of themselves and all others similarly )
 6  situated,                              )
                                           )
 7                    Plaintiffs,          )
                                           )
 8       vs.                               )      Case No.
                                           )  CV 11-5465 CAS (JCx)
 9  L'OREAL USA, INC., et al.,             )
                                           )
10                    Defendants.          )
    ───────────────────────────────────────)
11                                         )
    JILL GUIDO, et al., on behalf of       )
12  themselves and all others similarly    )
    situated,                              )
13                                         )
                      Plaintiffs,          )
14                                         )
         vs.                               )      Case No.
15                                         )  CV 11-1067 CAS (JCx)
    L'OREAL USA, INC., et al.,             )
16                                         )
                      Defendants.          )
17  ───────────────────────────────────────)

18

19                  REPORTER'S TRANSCRIPT OF
                        DAUBERT HEARING
20                 TUESDAY, JUNE 17, 2014
                         10:05 A.M.
21                 LOS ANGELES, CALIFORNIA

22  ─────────────────────────────────────────────────────

23       MYRA L. PONCE, CSR NO. 11544, RMR, CRR
              FEDERAL OFFICIAL COURT REPORTER
24           312 NORTH SPRING STREET, ROOM 430
              LOS ANGELES, CALIFORNIA  90012
25                     (213) 894-2305
```

1          **APPEARANCES OF COUNSEL:**

2

3    **FOR THE PLAINTIFFS:**

4         PARISI & HAVENS
          BY:  DAVID C. PARISI
5              Attorney at Law
          212 Marine Street
6         Santa Monica, California 90405
          (818) 990-1299
7
          KAMBER LAW
8         BY:  GRACE E. TERSIGNI
               Attorney at Law
9         100 Wall Street, 23rd Floor
          New York, New York  10005
10        (212) 461-6157

11

12   **FOR THE DEFENDANTS:**

13
          PAUL HASTINGS
14        BY:  DENNIS S. ELLIS
          BY:  KATHERINE FRENCK MURRAY
15             Attorneys at Law
          515 South Flower Street, 25th Floor
16        Los Angeles, California  90071
          (213) 683-6000
17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

1                          **INDEX OF WITNESSES**

2

3    PLAINTIFFS' WITNESSES                                    PAGE

4    MISRA, Ph.D., Sanjog

5        Direct Examination by Ms. Tersigni              7

6        Cross-Examination by Mr. Ellis                  20

7        Redirect Examination by Ms. Tersigni            65

8

9    DEFENDANTS' WITNESSES                                    PAGE

10   MISRA, Ph.D., Sanjog

11       Direct Examination by Mr. Ellis                 72

12       Cross-Examination by Ms. Tersigni               79

13

14

15

16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

1    **INDEX OF EXHIBITS**

2                                              FOR              FOR
                                          IDENTIFICATION    EVIDENCE
3    NUMBER  DESCRIPTION                       PG.             PG.

4    1  -  Engagement letter                    20              21

5    2  -  Hair Care Sub-Brand Report           42              43

6    4  -  Declaration of Sanjog Misra, Ph.D.   44

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**UNITED  STATES  DISTRICT  COURT**

```
 1              TUESDAY, JUNE 17, 2014; 10:05 A.M.

 2                  LOS ANGELES, CALIFORNIA

 3                          -oOo-

 4         THE COURTROOM DEPUTY:  Calling Calendar Item No. 1,

 5  Civil 11-1067, Jill Guido, et al., versus L'Oreal USA, Inc.,

 6  et al., and Civil 11-5465, Catherine Altamura, et al., versus

 7  L'Oreal USA, Inc., et al.

 8      Counsel, please state your appearances for the record.

 9         MR. ELLIS:  Good morning, Your Honor.  Dennis Ellis

10  and Catherine Murray of Paul Hastings, LLP, on behalf of

11  Defendant L'Oreal USA, Inc.

12         THE COURT:  All right.  Good morning.

13         MS. TERSIGNI:  Good morning, Your Honor.  Grace

14  Tersigni on behalf of plaintiffs.

15         THE COURT:  Good morning.

16         MR. PARISI:  Good morning, Your Honor.  David Parisi

17  on behalf of plaintiffs.

18         THE COURT:  Good morning.

19      Okay.  How do we want to proceed?  Do the plaintiffs want

20  to proffer the declaration, or do you have any supplemental

21  information you want to add before Mr. Ellis proceeds?

22         MS. TERSIGNI:  Your Honor, we would like to ask the

23  witness a few questions before L'Oreal asks questions.

24         THE COURT:  That's fine.  Because I obviously asked

25  for further information, so you might as well bring that out if
```

```
 1    you can.

 2              MS. TERSIGNI:  Okay.

 3              THE COURT:  All right.  Do you want to call your

 4    witness?

 5              MS. TERSIGNI:  Calling the witness Sanjog Misra,

 6    Dr. Sanjog Misra.

 7              THE COURTROOM DEPUTY:  Please raise your right hand.

 8         SANJOG MISRA, Ph.D., PLAINTIFFS' WITNESS, WAS SWORN

 9              THE COURTROOM DEPUTY:  Thank you.  Please have a

10    seat up on the stand.

11              THE COURT:  May I just excuse myself for one minute?

12    I left his declaration on my desk.

13              MR. ELLIS:  Your Honor, if it's -- we prepared a

14    witness binder that has it in there if you want.

15              THE COURT:  Okay.  Thank you, Mr. Ellis.  I think I

16    want mine.

17              MR. ELLIS:  Okay.

18              (Pause in the proceedings.)

19              THE COURTROOM DEPUTY:  Sir, will you please state

20    and spell your full name for the record.

21              THE WITNESS:  My first name is Sanjog, S-a-n-j-o-g,

22    the last name is Misra, M-i-s-r-a.

23              THE COURT:  Okay.  You may proceed.

24    ///

25    ///
```

```
 1                      DIRECT EXAMINATION
 2   BY MS. TERSIGNI:
 3   Q     Dr. Misra, what is your current occupation?
 4   A     I'm a full professor at the Anderson School of Management
 5   at UCLA.
 6   Q     And how long have you worked there?
 7   A     I'm coming up on two years at the Anderson School.
 8   Q     And can you describe some of the teaching -- the courses
 9   that you teach, some of the work that you've done at the
10   school?
11   A     So at the Anderson School, I have -- I teach an MBA class.
12   It's a graduate class on pricing.  I've also taught a course on
13   marketing analytics and a few doctoral courses for Ph.D.
14   students on -- essentially on methods relating to how consumers
15   and businesses make choices and the econometrics thereof.
16   Q     And what about your prior employment?  Please describe
17   your prior employment.
18   A     Sure.  Before coming to UCLA, I was a professor at the
19   Simon School of Business at the University of Rochester.  I've
20   been there for about 13 years, starting in 1999.  And
21   essentially, I started as an assistant professor, then was
22   promoted to associate and then to full.  And my duties there
23   were pretty much the same as they are at Anderson, included
24   research, teaching, and service to the school.
25   Q     And any other academic positions at any other
```

 1   institutions?

 2   A     Sure.  Yeah.  I've also taught at the Johnson School at

 3   Cornell University and at the Graduate School of Business at

 4   Stanford.  In addition, I've kind of done doctoral tutorials

 5   and teaching at various universities invited -- who had invited

 6   me, like Duke or Michigan, Chicago.

 7   Q     And are you familiar with the random coefficients demand

 8   estimation method?

 9   A     I am.  I'm very, very well versed in it.

10   Q     What is it?

11   A     So at its very core, it is -- it's a regression-based

12   framework.  It -- so just to give you background on it, the

13   idea of regression is to causally link some -- some marketing

14   activities, let's say in this case, to some outcomes of

15   interest, say, demand or market share.

16         About 20, 30 years ago, we found out that one of the key

17   ingredients in the regression was to -- was -- which was

18   missing was the ability to account for individual differences,

19   the fact that different people have different sensitivities to

20   different marketing activities, such as price or advertising.

21         So three authors, Berry, Levinsohn, and Pakes, wrote this

22   seminal paper in *Econometrica*, which is one of the flagship

23   journals in econometrics called -- which called out this --

24   this problem and showed that using historical market share data

25   and marketing activities, you could estimate the entire

1   distribution of tastes and preferences of individual consumers.

2   And that's what the random coefficients demand model is.  At

3   its core, it's econometrics, an econometric approach to doing a

4   sophisticated regression model that causally links marketing

5   activities or, for that matter, any other types of activities

6   and product attributes to market outcomes like sales or shares.

7   Q    Thank you.

8        And have you taught this type of method in your -- in your

9   teachings, in your class work?

10  A    Yes.  Many, many times.  So this is now a fairly standard

11  approach to estimating demand models.  It's required reading.

12  And every single Ph.D. student that goes through any program in

13  economics or marketing, now even in political science or

14  sociology, are required to understand and adopt this method

15  across all the top schools.

16       So in my teaching, obviously, I'm required to teach this

17  to my Ph.D. students as well.

18  Q    Thank you.

19       And are you familiar with the conjoint analysis?

20  A    Yes, I am.  And conjoint has an even longer and storied

21  history than the random coefficients demand model.  It's a

22  survey-based approach which tries to get at the same objective

23  of understanding how individual consumers make decisions.  The

24  only distinction between the random coefficients demand model

25  and the conjoint analysis is essentially the type of data

1    that's been used.  In the random coefficients demand model, we

2    use historical revealed preference data, the actual choices

3    that people made.  But as in conjoint, we take a sample of

4    consumers and ask them to make choices in -- in essentially a

5    survey setting and then use the choices that they made to infer

6    the decision process that they had and the wage that they

7    placed on different product attributes and features or, for

8    that matter, marketing activities.

9         So if you boil it down to -- to its core, the fundamental

10   primitives of both methods are identical.  They rely on this

11   idea that consumers act in self-interest, that they are utility

12   functions, they're -- how they assign value is a composite of

13   product attributes and product features, and the weight that

14   they assign to those product features.  Like once they had all

15   those utilities or values, they pick that option which gives

16   them the maximum utility.

17        And then if you -- if you have those -- in the conjoint

18   analysis, we get those choices from survey results.  And in the

19   random coefficients model, we aggregate the model up to a point

20   where it can be matched to actual shares or quantities of the

21   products sold.

22   Q    Thank you.

23        And have you taught methods to analyze data obtained from

24   the conjoint analysis?

25   A    Sure.  Again, the type of data that you get from conjoint

1    analysis is choices that individual people make, and that's not

2    any -- in any way different from how -- if you had individual

3    scanner panel data.  This is typical data we would get from

4    syndicated sources, like AC Nielsen or IRI, which record, let's

5    say, using your scanner or loyalty card what choices you've

6    made.

7         So the type of models that are used are essentially

8    individual-level random coefficient demand models rather than

9    at the aggregate level.  So the fundamental principles

10   governing both are the same.  And that's, again, something that

11   I'm required to teach to all Ph.D. students and now even to MBA

12   students who are -- who are at Anderson.

13   Q    And have you performed any of your own research with

14   respect to the random coefficient demand estimation method?

15   A    Many, many times.  So a number of my papers use underlying

16   core econometric methods that I used in random coefficients

17   demand estimations.

18   Q    And are these -- are these papers peer reviewed?

19   A    Yes.  They go through a fairly rigorous peer review

20   process.  So the process essentially is you submit a paper to a

21   leading journal.  There is an editor who assigns another -- an

22   associate editor and also usually three reviewers who are at

23   comparable or peer schools.  They are anonymous, so we don't

24   get to -- the author doesn't get to see who the reviewers are.

25   They essentially go through the paper in -- in some detail,

1   usually with a very -- with a negative bias to kind of bring

2   out all the holes.  And this -- and they come back with

3   comments, you address those comments.  This process will

4   iterate maybe three or four rounds upon which, if all the

5   reviewers sign off and the associate editor signs off and the

6   editor signs off, then the paper gets published.

7   Q    Thank you.

8        And can you briefly describe or identify the publications

9   that are addressed of the RCDE or conjoint analysis and/or

10  conjoint analysis?

11  A    So the -- the fundamental paper in this area is a paper by

12  Berry, Levinsohn, and Pakes that came out in *Econometrica*.

13  There is a follow-up paper by Aviv Nevo which uses the same

14  method to evaluate the characteristics of cereal, including

15  subjective characteristics of cereals like mushiness or the

16  sugariness, crunchiness of the cereal.

17       And then there's a number of applications.  In my own

18  research, the methodologies have been used both at the

19  individual levels or have -- for example, one paper in

20  *Marketing Science* called "Observed and Unobserved

21  Heterogeneity."  That's one of them.  There's another one in

22  *Marketing Science* called "Disentangling Preference from State

23  Dependence."  I can't remember the exact titles, but that's

24  kind of what it is.

25       And then again, the same -- the core methodology is used

1    in a number of my papers.  I can go through it.

2    Q     So these are your published articles?

3    A     These are my published articles.

4    Q     All right.  Thank you.

5          And have you been invited to speak at conferences to -- or

6    in any other forums to present your research?

7    A     Yes.  So I've pretty much given invited talks.  So these

8    are talks that each -- the faculty member gets invited to a

9    peer school.  I've given talks at pretty much all the top 20

10   schools, including Harvard, Stanford, Wharton, Chicago, Duke,

11   you name it.  And I've presented in many, many conferences.

12   It's on my vitae.

13   Q     Are you -- are you the editor of any publications

14   regarding these methods?

15   A     Yes.  So I -- at the time this case started, I was the

16   associate editor for -- at *Marketing Science*, which is a

17   premier journal for quantitative methods in marketing.  I was

18   also the associate editor -- I am also the associate editor at

19   the *International Journal of Research in Marketing*.  I've been

20   an associate editor of the *Journal of Marketing Research*.  And

21   I'm currently the -- one of the co-editors of the *Quantitative*

22   *Marketing and Econometrics* journal.

23   Q     And do you -- have you -- do you -- have you provided

24   consultation to businesses?

25   A     Yes.  Again, too many to mention.  I'm currently an

```
 1   advisor to AOL and I've done a bunch of consulting projects
 2   across many different industries.
 3   Q    Without revealing any trade secrets or anything that might
 4   be subject to a nondisclosure agreement, can you just give us
 5   some idea -- some description of some of your consultation that
 6   relates to RCDE and/or conjoint analysis?
 7   A    Sure.  So in terms of random coefficient demand models,
 8   it's been used not just in the context of products but also in
 9   terms of services and the evaluation of other marketing
10   activities.  I've done a bunch of products -- projects for
11   firms evaluating the effectiveness of different types of sales
12   activities.
13        Again, if you look at my papers, many of them are actually
14   based -- one of them I can talk about because the name, it's
15   for MGM where we're talking about how to evaluate the
16   effectiveness of different elements of promotions on people's
17   choices.  So this is individual-level choices.
18        And then there's a bunch of pharma companies that I've
19   done work on to evaluate different characteristics of drugs and
20   how they -- and doctors' prescription choices.
21   Q    Thank you.
22        And do you belong to any professional associations?
23   A    I do.  American Marketing Association, Informs, the
24   American Economic Association, and probably a bunch of others
25   that I can't remember.
```

```
 1  Q     And in terms of your education, can you list your degrees?
 2  A     Sure.  I have a bachelor's with honors in economics from
 3  Ravenshaw College in India, then I got my MBA -- or the
 4  equivalent of an MBA from FORE School of Management in
 5  New Delhi.  I got my master's in statistics from -- from the
 6  University of -- the State University of New York at Buffalo
 7  and also my Ph.D. from the same school.
 8  Q     Thank you.
 9        And what were you asked to do in this case?
10  A     I was asked to state my professional opinion whether or
11  not there existed methodologies that could evaluate the market
12  value of Serum with and without the flammability warning.
13  Q     And what did you -- what were your conclusions with
14  respect to that question?
15  A     The -- in the affirmative, in the sense that they -- to my
16  knowledge, there exists at least two methods -- the random
17  coefficients demand estimation and conjoint analysis -- that
18  are capable of discerning and quantifying the -- the value of
19  the product and market outcomes associated with it such as
20  prices or market shares or quantities with and without the
21  flammability warning.
22  Q     And what data did you consider -- what facts or data did
23  you consider in forming your conclusion, your opinion?
24  A     So for the random coefficients demand model, I was shown
25  that there was data available from -- of the type that we
```

UNITED STATES DISTRICT COURT

```
 1   typically get from syndicated data sources, such as IRI or
 2   Nielson.  And if that data is available, then essentially that,
 3   coupled with some -- some supplemental data that firms usually
 4   have access to, such as advertising, pricing, that data, if --
 5   if made available, could easily be used to estimate the random
 6   coefficients demand model because that's typically what -- the
 7   type of data we use.
 8        As far as conjoint analysis goes, it's far simpler.  It
 9   just requires the creation of -- of a survey-based instrument
10   applied to a sample.  And then once that data is available,
11   then essentially the estimation is fairly straightforward and
12   standard.
13        So essentially, given what my experience is in the matter
14   and what I believe that I have some data that might be
15   available, I could fairly, you know, surely say that this --
16   this could be done.
17             MR. ELLIS:  Objection.  Move to strike.
18   Speculation, "might be available."
19             THE COURT:  Overruled.
20   BY MS. TERSIGNI:
21   Q    And what is the basis for your belief that the -- the data
22   that you need to perform an RCDE analysis might be available?
23   A    I shouldn't even say "might."  I know it's available in
24   terms of scanner-panel data.
25        You know, I've got close to now 15 years of experience
```

UNITED STATES DISTRICT COURT

```
 1    dealing with scanner-panel data.  This type of data is
 2    typically elected by IRI, Nielson.  In this industry and across
 3    other industries like IMS Health, there's a number of
 4    providers.  And firms typically rely on this data to make good
 5    marketing decisions.  That's how they make their decisions.
 6         I've consulted with a number of firms, used this data with
 7    a number of firms.  So as far as the scanner-panel data goes --
 8    or scanner data, not even the panel but just aggregated
 9    store-level sales data and marketing and merchandising data,
10    that data exists.
11         I also know for a fact that there exists databases that
12    contain characteristics of products from my own research.  UCLA
13    has a subscription to such data.  So I know that the data
14    exists.  And given that I believe such data exists and I know
15    the methodologies that can be applied to this data, that leads
16    me to -- to my conclusion which -- that this methodology should
17    be applicable in this context as well.
18    Q    And with respect --
19              MR. ELLIS:  Objection.
20              THE COURT:  What?
21              MR. ELLIS:  Speculation.  Nonresponsive.
22              THE COURT:  Overruled.
23         I have a question.  When you talk about scanner-panel
24    data, is that scanner-panel data related to this product or
25    what --
```

1          THE WITNESS:  So -- so the way the scanner data

2     exists -- there are two different types of scanner data.  One

3     is a scanner-panel data.  For example, Nielson will have a set

4     of households, something around 40- to 50,000 households for

5     which every single product that they buy gets scanned and that

6     gets recorded to a database.  That's what I call a

7     scanner-panel data.

8          But the broader data set is what's called typically

9     scanner data which comes from actual checkouts at stores which

10    is, again, aggregated by Nielson or by IRI.  And that's

11    available across pretty much any product category that's scored

12    in supermarkets, convenience stores, or at drug stores.

13         For this product category, I have not looked into this to

14    be -- although the category data exists through a central --

15    University of Chicago, I'm not supposed to be using that or

16    looking at that for the purposes of any commercial or any

17    litigation purposes apart from my own -- own academic research.

18    So I cannot claim to know whether or not it exists for this

19    particular product.

20         But given the documents that I have seen and which we

21    discussed during my deposition, I saw reports that came out of

22    IRI which had pretty much the same data that leads me to

23    believe that such data exists.

24         THE COURT:  Assuming such data exists and assuming

25    you can't use what is available for your research, how would

```
 1    you go about obtaining this missing scanner-panel data?
 2              THE WITNESS:  So one possibility is to either
 3    subpoena or purchase the data from IRI or Nielson.  And that,
 4    obviously, would give us the data we needed.  This is for the
 5    random coefficients demand model.  And if that data -- that's
 6    partly why I kind of came up -- suggested two different
 7    approaches.  If for whatever reason that data was not available
 8    or not enough, there is always the route of going -- collecting
 9    your own conjoint data, which has, again, a number of
10    applications.  And it's got a long and storied history in terms
11    of its applicability to doing exactly the same thing.
12         So essentially what we would do is go in, spend some time,
13    create a well thought-out research design and survey, get --
14    get a representative sample of consumers, sample them, survey
15    them, get that data, and then analyze that data to -- to get
16    whatever answer comes out in terms of the value of the
17    attributes.
18              THE COURT:  All right.
19              MS. TERSIGNI:  No further questions.
20              THE COURT:  Okay.  Mr. Ellis.
21              THE WITNESS:  Can I have a glass of water?
22              THE COURT:  Water, yes.  There is water -- did you
23    put it in the pitcher right there?  We'll get you water.
24              MR. PARISI:  May I?
25              THE COURT:  He'll get it.  It will be easier.
```

UNITED STATES DISTRICT COURT

```
 1   Probably preferable.  We'll bring you -- okay.  You're okay.

 2        All right.  Why don't you proceed.

 3             MR. ELLIS:  Thank you, Your Honor.

 4                        CROSS-EXAMINATION

 5   BY MR. ELLIS:

 6   Q    Dr. Misra, good morning.

 7   A    Good morning.

 8   Q    You're retained by the plaintiffs in this case; correct?

 9   A    I am.

10   Q    And if you could take a look at that binder to the side of

11   you and turn to Tab 1, please.

12   A    Sorry, which page?

13   Q    Tab 1.

14   A    Tab 1.

15             (Exhibit 1 for identification.)

16   BY MR. ELLIS:

17   Q    You see a document there called "Expert Witness Consulting

18   Agreement"?

19   A    I do.

20   Q    And if you take a look at the last page of the document,

21   can you tell me if that is your signature on that document?

22   A    It is.

23   Q    And this was a document you signed on or about the date

24   that's indicated?

25   A    It is.
```

```
 1   Q    And it was countersigned by the plaintiffs' attorneys in
 2   this case; is that right?
 3   A    Yes.
 4   Q    And this is the engagement letter that you executed in
 5   this case; correct?
 6   A    You mean the agreement?
 7   Q    Yes.
 8   A    Yes.
 9          MR. ELLIS:  Your Honor, offer Exhibit 1.
10          THE COURT:  Yes.  It will be received.
11          (Exhibit 1 received into evidence.)
12   BY MR. ELLIS:
13   Q    Now, you were retained in this case in the first week of
14   December 2013; is that right?
15   A    That's about right, yes.
16   Q    And as you said, your charge in this case was to ascertain
17   whether or not there were methodologies that would allow the
18   parties in this case to value the -- or to determine the value
19   the consumers placed on the flammability warning on the Serum;
20   is that right?
21   A    That's right.
22   Q    Now, the particular product characteristic at play -- at
23   issue in this case is a flammability warning; right?
24   A    I believe so.
25   Q    But you -- and you proposed two methodologies; is that
```

1  right?

2  A     Yes.

3  Q     And one of them is the random coefficients demand

4  estimation model we talked about; right?

5  A     Yes.

6  Q     And the other one is the conjoint analysis; right?

7  A     That's right.

8  Q     But you didn't apply either one of those methodologies to

9  the issue of whether or not consumers placed a value on the

10 flammability warning in this case; correct?

11 A     I was not asked to, so no.

12 Q     That's a yes -- that's a "no," you didn't do that; right?

13 A     No, I did not.  No.

14 Q     So you don't know with respect to either methodology

15 whether or not consumers in this case placed any importance on

16 the flammability warning; correct?

17 A     Either way, I have no data or analysis to support whether

18 they do or they do not.

19 Q     And -- and you don't have a preference with respect to

20 either one of these methodologies.  I think you said on your

21 direct testimony it's just a matter of what type of data you

22 have; right?

23 A     I don't have a strong preference.  The random coefficients

24 demand model is calibrated on revealed preference data, the

25 actual choices that people make.  And in my research, I've kind

```
 1   of leaned towards -- or I prefer that type of data because

 2   it's -- it's the choices of the consumers in question.

 3       Having said that, you know, if that data is not available,

 4   the conjoint analysis is just as viable an approach and it's --

 5   again, it's got a long and storied history of being used in

 6   such circumstances.

 7       So overall, from a peer methodological perspective, I

 8   don't have any strong preferences.  From a data perspective,

 9   probably the random coefficients demand model.  But again, it

10   just is a question of what data is available to us.

11   Q    I just want to make sure that I got your testimony correct

12   and I didn't make a mistake.  It's true that the data that you

13   have drives the methodology you perform; correct?

14   A    The econometric method -- methodology?  Yes.

15   Q    And if you don't have sufficient secondary data of

16   preferences, you can't apply the random coefficients demand

17   estimation model; correct?

18   A    The random coefficients demand estimation model, yes,

19   that's correct.  If we do not have approach and sufficient

20   data, then you can still apply it.  But the estimates that you

21   will get from that -- so it's a question of what you mean by

22   "insufficient data."  I guess I'm not sure about that.

23   Q    Well, I mean to say what you said in your deposition.  You

24   recall you took a deposition in this case; right?

25   A    I do.
```

1    Q     And you recall that you talked about -- that you needed

2    data with sufficient variation to be able to apply the random

3    coefficient demand estimation model, don't you recall that?

4    A     That is correct.

5    Q     And when you testified in this case, you were telling the

6    truth; right?

7    A     Yes.

8    Q     And so I mean it the same way you're saying.  If you don't

9    have enough secondary data with variation, you can't apply the

10   random coefficients demand estimation model.  True statement;

11   right?

12   A     So let me clarify what I said.  If there is --

13   Q     Let me stop you there.

14   A     Can I finish my --

15              THE COURT:  Can you let him finish?

16              MR. ELLIS:  Sure.

17              THE COURT:  And stay right there at the lectern.

18              MR. ELLIS:  Sure, Your Honor.

19              THE WITNESS:  If you're -- in my deposition, I

20   stated that if there wasn't sufficient variation, then the

21   random coefficients model cannot be reliably applied.  That is

22   100 percent true because what would happen if there was not

23   sufficient variation is that the standard errors would be large

24   and we could not be confident about the results we got.

25         And so I stand by that statement; that in the absence of

```
 1    variation in the data, the results from the random coefficients

 2    models essentially would be -- wouldn't be useful and,

 3    therefore, I wouldn't essentially apply them.

 4    BY MR. ELLIS:

 5    Q    Now, you haven't applied either method as we talked about;

 6    right?

 7    A    I have not applied either method, that is correct.

 8    Q    And you haven't even done a preliminary analysis either,

 9    have you?

10    A    What do you mean by a "preliminary analysis" --

11    "preliminary analysis"?

12    Q    You -- well, you gave a declaration, you signed a

13    declaration yesterday where you said you hadn't even done any

14    preliminary work to apply the random coefficients demand

15    estimation model or the conjoint analysis?

16    A    That is correct.

17    Q    And so you haven't even started out the process of

18    figuring out whether or not you have the data to apply either

19    one of these models; right?

20    A    So those are two different questions.  Have I done

21    anything?  No.  Do I -- have I done anything to think about

22    whether or not these data exists?  That's untrue.  Clearly, I

23    just stated that I thought about this quite some time and

24    believed that the data exists.

25         So I have done work to establish -- or to -- to assure
```

```
 1   myself that such data is available.  So that part, yes.  Have I
 2   done anything in terms of actual estimation or work in terms of
 3   estimating the -- the models?  No.
 4   Q     And maybe it's my fault.  I just want to be clear, is that
 5   you haven't preliminarily taken the data you've gotten and
 6   applied it to either perform an analysis based on the random
 7   coefficient demand estimation model or the conjoint analysis?
 8   A     That is correct.
 9   Q     All right.  And in this case, this is your first time
10   testifying as an expert; is that right?
11   A     It is.
12   Q     You're doing great.
13   A     Thank you.
14   Q     And -- and it's your first time that you testified in a
15   deposition; right?
16   A     That is true.
17   Q     And this is the first time you've ever been retained as an
18   expert in any case; is that right?
19   A     That's true.
20   Q     Now, I -- I thought at your deposition you told me that
21   your career has been spent pretty much in academia; is that
22   true?
23   A     Yes.  The vast -- a large proportion of my -- my career
24   has been in academia apart from, you know, consulting and work
25   with firms that I do as part of my research or -- or as pure
```

consulting.

Q    Well, you mentioned in your deposition that you did a little bit of work for Microsoft back in India.  But other than that, everything you've done has been from an educational perspective.  Is that still true today?

A    The -- what I mentioned in my deposition was that I had a full-time job in India, but I have continued to do work with firms.  So my research papers, a number of them are partnered with -- with firms.  So my sales-force papers are partnered with a firm in upstate New York.  My recent paper is -- it's -- the title has MGM on it, so clearly that's with -- with MGM, Incorporated -- Resorts International.  I am currently an advisor to AOL and chair of the research committee at Convertro.  So I continue to do work with firms which supports my research as well.

Q    Okay.  You're not aware of the random coefficient demand estimation model ever being used to measure the importance or value the consumers place on flammability warnings; correct?

A    On flammability warnings particularly, no.

Q    And you're not -- you've never read any peer-reported journals where anybody has assessed the value that consumers place on flammability warnings; correct?

A    Again, particularly on flammability warnings, no.  But to the extent that a flammability warning is another attribute of the product, there's a number of studies on evaluating product

1   attributes.

2   Q    So that's a -- that's a "no"; right?  You haven't seen

3   that?

4   A    On flammability warnings particularly, no.

5   Q    And you've never done that; right?  You've never used the

6   random coefficient demand estimation model to value the

7   importance that consumers place on flammability warnings;

8   correct?

9   A    I couldn't have.  If I've not seen one, I couldn't have

10  done it myself either.

11  Q    Just making sure we got it right.

12       And you haven't done that with respect to the conjoint

13  analysis either, you haven't applied the conjoint analysis to

14  determine if consumers place any value on flammability

15  warnings; correct?

16  A    I have not.

17  Q    And you've not done any consumer surveys yourself with

18  respect to this particular case; right?

19  A    I have not.

20  Q    And you haven't done any consumer surveys ever with

21  respect to whether or not consumers place a value on

22  flammability warnings; right?

23  A    On flammability warnings?  No.

24  Q    And you haven't done any consumer surveys with respect to

25  the cosmetic industry generally; right?

1    A      No, not with the cosmetic industry.

2    Q      And you haven't done any consumer surveys with respect to

3    the hair care industry either; right?

4    A      Not with the hair care industry either, no.

5    Q      Now, the random coefficient demand estimation model, let's

6    talk just a little bit about that if you don't mind.  It's

7    really -- it's really kind of a -- an adjunct or flows from the

8    work done by Daniel McFadden with respect to the random utility

9    framework; is that a fair statement?

10   A      You could see it that way.  It -- it's an offshoot of

11   regression-based methods.  If you wanted to interpret it as

12   what we call a structural model, then you could tie it to the

13   work that Dan McFadden did, for which he got the Nobel Prize,

14   but you don't have to if you don't want to.

15   Q      I thought that's what you told me at the deposition, is

16   that it comes from McFadden.  Is that a fair characterization

17   of what you told me?

18   A      You could definitely derive the random coefficients

19   demand -- so let me just make sure that we are on the same page

20   here.  The random coefficients demand estimation is an

21   econometric methodology to estimate parameters of a model that

22   can be derived from the work that Daniel McFadden did in terms

23   of random utility demand models.

24   Q      And that's actually what happened, is that Steven Berry,

25   James Levinsohn, and Ariel Pakes, they took that framework and

**UNITED STATES DISTRICT COURT**

1    in 1995 they developed the random coefficient demand estimation

2    model as we know today to find out the value that consumers

3    place on characteristics in the automobile industry; correct?

4    A     That's true, yes.

5    Q     True?

6    A     Yes.

7    Q     And one of the key things that they found in their work

8    was that the automobile industry was sufficiently developed

9    such that there was a lot of secondary data about preferences.

10   Do you recall that?

11   A     Yes.

12   Q     And so that differs certainly --

13   A     Actually, just to be precise, there was never any data on

14   preferences.  That's the whole idea, that you don't have data

15   on preferences.  You have data on sales and you have data on

16   market characteristics and product characteristics but no data

17   on preferences.  You're trying to infer what consumers'

18   preferences are.

19   Q     Thank you for that clarification, because that is what

20   they were trying to do, is how they preference.  And what they

21   had was a lot of data on sales for a long period of time with

22   different models, with different characteristics; correct?

23   A     That is correct.

24   Q     And that is something you don't have here, as far as you

25   know, with respect to the Serum.  You don't have the kind of

1    developed industry with substantial data on -- on

2    characteristics of the product, as far as you know; right?

3    A    That's not true.

4         So the follow-up paper to Berry, Levinsohn, and Pakes was

5    another paper by the same authors where they took survey data

6    and combined it with the -- with the original Berry, Levinsohn,

7    and Pakes methodology to show that having individual-level data

8    could -- even with shorter time spans could be -- could be even

9    better than the original Barry, Levinsohn, and Pakes approach.

10        So I -- I can't say for a fact that there isn't enough

11   data right now.  My -- everything I know leads me to believe

12   that there exists sufficient data.

13        Also, keep in mind that in automobiles, unlike in consumer

14   packaged goods industries, the granularity of the data is much

15   coarser and the cycle of purchases are much coarser.  So people

16   don't buy cars every month or every week.  They buy it once

17   maybe every seven years, whereas any consumer packaged goods or

18   anything that's sold in the supermarket, the cycles are much

19   shorter which gives you a lot more granularity, a lot more

20   precision.  So you don't need a lot -- you know, like they had

21   10, 15 years of data, you could estimate it much, much shorter

22   time-wise.  In fact, it's been applied pretty much for yogurt

23   or for a number of -- for margarine, for butter, for tuna,

24   for -- the same model has been applied in a number of

25   categories where the time pricing is a couple of years at most

```
 1   because of the granularity that's afforded to you in CPG

 2   industries, which is very -- fundamentally very different from

 3   automobiles.

 4            THE COURT:  Okay.  I'm going to have to take a quick

 5   recess.  I have a contact that has slipped, and I have to go

 6   track it down in my eye.

 7            THE COURTROOM DEPUTY:  Court is in recess.

 8            (Break taken.)

 9            THE COURTROOM DEPUTY:  Court is again in session.

10            MR. ELLIS:  May I continue, Your Honor?

11            THE COURT:  Go ahead.  Yes.

12            MR. ELLIS:  Thank you, Your Honor.

13   BY MR. ELLIS:

14   Q    Dr. Misra, there was more information in 1995 when Berry,

15   Levinsohn, and Pakes offered their study on the automobile

16   industry than there is today with respect to the Serum, as far

17   as you know; correct?

18   A    I cannot answer that question.  I have -- I have an idea

19   of how much data was available for the automobile study in the

20   sense that it was monthly shares and prices data stretching

21   back on a -- for -- I don't recall exactly how many years, but

22   let's say it was 10, 15 years.

23        So monthly data for 15 years as opposed to the type of

24   scanner-panel data that's available today, which is a

25   cross-market.  So that was also national data, not
```

```
1   geographically disbursed data.  So now we have variation which
2   is geographic, we have variation at the weekly level, maybe
3   even at the daily level, but -- so I can't compare the two --
4   Q    Let me ask you a different question, then.  If you don't
5   have the data as you say, you can't run the random coefficient
6   demand estimation model; right?
7   A    That's correct.  If I don't have the data, I can't run any
8   analysis.
9   Q    And you didn't have the data at the time of your
10  deposition; correct?
11  A    I still don't have the data, no.
12  Q    You still don't; right?
13  A    No.
14  Q    So you don't know, as you sit here today, whether or not
15  you can run the random coefficient demand estimation model and
16  come up with any answer as to whether or not consumers place an
17  emphasis on the flammability warning; correct?
18  A    Well, there's a leap there.  I -- I know I can conduct the
19  analysis if I was given access to the data, and I believe that
20  that data exists.  I don't have the data; therefore, I can't do
21  the analysis.  Those are two completely different, disparate
22  things.
23  Q    Well, it's -- the point being is that it's conjecture on
24  your part whether or not a consumer placed any value on the
25  flammability warning or the lack thereof related to the Serum;
```

UNITED STATES DISTRICT COURT

1   correct?

2   A    I have made no conjecture whatsoever.  And during my

3   deposition and today, I would say unless I do the analysis, I

4   cannot say whether or not there is any effect or there is no

5   effect or what the effect might be and what the value would be

6   placed.  And that's why the best thing to do is to do the

7   analysis.

8   Q    So at this point in time, it would be pure conjecture on

9   your part to determine whether or not, if there was an increase

10  in price, that related to the removal of the flammability

11  warning; right?

12  A    I have not made any such claim whatsoever.  So I'm not

13  conjecturing.  I'm not --

14  Q    I'm not suggesting you are.  I just --

15  A    If you did it, you would be conjecturing, yes.

16  Q    Sure.  So I'm just making sure I got that point for the

17  record --

18  A    Sure.

19  Q    -- is that if you were to say, as you sit here today, that

20  the price of the Serum went up because the removal of the

21  flammability warning, that would be conjecture on your part?

22  A    That would be conjecture if I did say that, yes.

23  Q    And you haven't said that; right?

24  A    I have not said that.

25  Q    Now, with respect to the conjoint analysis, it relies on

**UNITED STATES DISTRICT COURT**

```
 1   consumer surveys as you talked about; right?
 2   A     That's true.
 3   Q     You can't do a conjoint analysis without doing a consumer
 4   survey; right?
 5   A     That's true.
 6   Q     It's primary data, data that you create through an
 7   analysis in creating and asking questions of consumers; right?
 8   A     That is true.
 9   Q     And as we discussed, you haven't performed any consumer
10   surveys in this case; right?
11   A     I have not.
12   Q     And you've never performed a consumer survey in the
13   context of a litigation, have you?
14   A     I have not.
15   Q     And you've never done a consumer survey assessing the
16   value consumers place on flammability warnings we have talked
17   about; right?
18   A     I have not.
19   Q     And you haven't done a consumer survey in a cosmetic
20   industry situation; right?
21   A     I have not.
22   Q     And you haven't done a consumer survey with respect to
23   hair care; right?
24   A     That is true.
25   Q     Were you asked by the plaintiffs to do a consumer survey?
```

```
1    A    I was not.

2    Q    Were you asked by them to do a full conjoint analysis;

3    right?  Were you asked by them to do that?

4    A    No.  Again -- I'll state again, what I was asked to do was

5    simply to state whether or not these methodologies exist and

6    are capable of answering the question as to the value of the

7    product with and without the flammability warning and the --

8    and the outcomes that would depend on that, such as prices or

9    market shares or sales.

10   Q    And I -- I think we got this clear, but I want to make

11   sure because it could be my fault, is that you haven't run

12   either model; true?

13   A    True.

14   Q    And the reason why you haven't run the random coefficient

15   demand estimation model is because, according to you, you don't

16   have the data; right?

17   A    I don't have the data and I was not asked to do it.

18            MS. TERSIGNI:  Objection.  Objection.  Misstates

19   testimony.

20            THE COURT:  I'm not sure that it does.  But he can

21   certainly correct it if -- if it isn't his testimony.

22   BY MR. ELLIS:

23   Q    You haven't run the random coefficient demand estimation

24   model because you don't have the data; right?

25   A    Okay.  I have not -- there's two reasons why I haven't
```

**UNITED STATES DISTRICT COURT**

```
 1  done it.  One is I was not asked to do it.  Second, I don't
 2  have the data.  So even if I was asked to do it, I couldn't do
 3  it.
 4  Q    Okay.  And so you haven't -- you could get the data for
 5  the conjoint analysis by doing a consumer survey, and you
 6  haven't been asked to do that either; right?
 7  A    I have not, no.
 8  Q    Now, with respect to the random coefficient demand
 9  estimation model -- let me just make sure.  You were retained
10  in this case in December of last year; right?
11  A    That's right.
12  Q    And through all -- December through today, you have never
13  been asked to do a consumer survey or to conduct a conjoint
14  analysis; right?
15  A    I have not.
16  Q    Now, with respect to the random coefficient demand
17  estimation model in litigation, you're only aware of its use in
18  litigation with respect to the Federal Trade Commission when
19  two firms are merging; right?
20  A    I'm not aware of particular case details in any other
21  context.  Based on my readings and my research, I am aware that
22  it is the -- the standard model used by the Department of
23  Justice and by the Federal Trade Commission to evaluate product
24  features and what would happen to them when -- when firms
25  merge.  But no, I don't have any other -- beyond that, I don't
```

```
 1   have any other information.
 2   Q    And you're certainly not aware of the random coefficient
 3   demand estimation model being used in a lawsuit to value a
 4   specific product feature or characteristic; correct?
 5   A    No, I'm not, but I will say that this is -- again, I don't
 6   have detailed information, but I was told by the -- by counsel
 7   that regression --
 8              MR. ELLIS:  Objection.  Hearsay.
 9              THE COURT:  Overruled.
10              THE WITNESS:  -- that regression analysis has been
11   used.  And random coefficients demand models are -- are
12   essentially a much more sophisticated approach to doing the
13   regression than what's being used in the sense that regression
14   analysis assumes that all consumers are homogenous.  They have
15   the same preferences and essentially tries to trace out the
16   average preference in the marketplace, whereas the random
17   coefficients demand model would trace out the distribution of
18   preferences.  So you might be able to pick up the differences
19   across people.
20        So even if it hasn't been used, which I can't point to
21   case law on that, it should be used if -- in lieu of regression
22   being used, which is -- which we've given up on about 20 years
23   ago in the -- for -- for good reason.
24   BY MR. ELLIS:
25   Q    From December when you were engaged to today, have you
```

```
 1   done any search to determine whether or not the random
 2   coefficient demand estimation model has been used in litigation
 3   to value a product feature characteristic?
 4   A    I have done a Google search.  I don't have access to --
 5   Q    What did you find?
 6   A    I found a couple of citations on Google Search, but I have
 7   no idea what they are.  So I -- I didn't pursue them.
 8   Q    So the answer is from December to today, you did a couple
 9   of Google searches and you haven't found any use of the random
10   coefficient demand estimation model in litigation that you can
11   testify to here today; correct?
12   A    I -- yes.  I don't know if I did the search wrong, whether
13   there isn't any application; I have no idea.
14   Q    You're a doctor in marketing.  I suspect you probably did
15   the search right.
16   A    I'm not a doctor in law.
17   Q    I said marketing.
18   A    I know, but I -- what I'm telling you is that if you ask
19   me are there papers related to random coefficient demand models
20   and the estimation of product, the value that product features
21   have and how consumers assign value to that in marketing, I can
22   give you close to 100 papers on that because I know what
23   sources of what citation databases exist.
24   Q    I'm --
25   A    I have -- I have no idea where to look for case law.  What
```

```
 1   I did tell the counsel was I cannot believe that it doesn't
 2   exist.  But I have -- I have no -- I'm not an expert in
 3   searching for case law.  So --
 4   Q    Well -- and maybe I was a little flippant.  I was talking
 5   about perhaps you were an expert in searching on Google, not
 6   necessarily Westlaw case law.
 7   A    That, I am not.
 8   Q    And you're not aware of the conjoint method being used in
 9   litigation -- in this type of litigation as to the value of
10   flammability warning; right?
11   A    I don't have firsthand knowledge, but I have heard among
12   other people -- Professor Hanssens, Mike Lee, Peter Rossi --
13   talk about the use of conjoint analysis in various cases,
14   high-profile cases like the Samsung-Apple case in terms of
15   evaluating iPhone product features.
16        But, you know, again, I have not done research myself.
17   This is -- as you would say, I just heard them talk about it.
18   So I believe that it has been used numerous times, but I can't
19   point to any -- any citations myself.
20   Q    And thank you for correcting me because that -- that was
21   the point I was -- I was listening, I was trying to get the
22   point that you don't know about flammability but you do know
23   conjoint's been used in other context -- right? -- in
24   litigation?
25   A    Yeah.  Yep.
```

```
 1   Q     And people who do consumer surveys -- you said they have a
 2   more storied history, I think that was the phrase you used, for
 3   consumer surveys; right?
 4   A     Yes.
 5   Q     And as far as you know, based on your work, that is
 6   something that is typically done when you don't have access to
 7   good secondary data that has sufficient variation.  You do a --
 8   a consumer survey and you perform a conjoint analysis.  That's
 9   one approach; right?
10   A     That's one approach, yes.
11   Q     And it's -- and it's an approach you believe in as being
12   acceptable; right?
13   A     Yes.  I have nothing against that approach, yes.
14   Q     It can give you the same results and even give greater
15   granularity into preferences that -- than a random coefficient
16   demand estimation model in some ways; right?
17   A     I don't know the answer to that.  Based on what?
18   Q     Well, based on -- what I believe you told me at your
19   deposition was that you can create this world where you can ask
20   more questions and even create eventualities that didn't exist
21   in the secondary situation and you can ask those questions
22   about preferences.  Is that a fair way of putting it?
23   A     Yes.  So you can do contractuals beyond, but it -- you can
24   do contractuals with either methods.  I'm not sure -- I thought
25   your question was one gives you more precise results or better
```

UNITED STATES DISTRICT COURT

1    results than the other.  I can't make that claim because that

2    depends on the type of data that you collect from -- for either

3    approach.  They're both viable approaches.  If you have the

4    right type of data for a coefficients demand model, that's --

5    that's fantastic.  You can get very good results with that.  If

6    you don't have access to that, you can do a conjoint.

7    Q    And certainly you're capable of doing a conjoint analysis

8    in this particular case to determine whether or not consumers

9    place a value on the flammability warning on the Serum; right?

10   A    I -- if I was asked to do it, yes, I would -- I would be

11   able to do it.

12   Q    You could do it, but you just haven't been asked to do it;

13   right?

14   A    Fair enough.  Yep.

15   Q    Now, you submitted a declaration in this case where you

16   looked at some information provided to you and you determined

17   from the period 2005 to 2006 the price of the Serum was 3.47.

18   And after 2007, the price was 3.86.  It remained that way in

19   2008.  Is that a fair characterization of your declaration?

20   A    It is.

21   Q    Now, I'm going to ask you to take a look in that binder

22   again as to Tab 2, if you would, please.

23             (Exhibit 2 for identification.)

24   BY MR. ELLIS:

25   Q    And you've seen the documents under Tab 2; correct?

```
 1   A     I believe I have.  Yes.
 2   Q     And, in fact, those were the documents that you used to
 3   come up with this calculation about the 3.47 versus 3.86 price
 4   for the Serum with the flammability warning and after; right?
 5   A     I believe so.  I'm not 100 percent sure, but I believe
 6   these are -- not on the first page but -- maybe on the second
 7   page.  Yeah.  I think these are it.
 8              MR. ELLIS:  Is there an objection?  May I continue,
 9   Your Honor?
10              THE COURT:  You may.
11              MR. ELLIS:  Your Honor, I offer Exhibit 2.
12              THE COURT:  Okay.  It will be received.
13              (Exhibit 2 received into evidence.)
14   BY MR. ELLIS:
15   Q     Now, as you said in your declaration, these documents
16   don't isolate the price of the Serum alone.  They're a
17   collection of aggregate data over several products; right?
18              MS. TERSIGNI:  Your Honor?
19              THE COURT:  Yes.
20              MS. TERSIGNI:  Can the witness have some time just
21   to look at the documents to make sure --
22              THE COURT:  Of course.
23              MS. TERSIGNI:  Thank you.
24              (Pause in the proceedings.)
25              THE WITNESS:  I wouldn't know.  The -- a number of
```

```
 1    items here are redacted.  So what I used was essentially only
 2    the data that was available here.  So I'm not sure.  All I can
 3    say is my analysis was based on the products that I believed
 4    were the focal product in question here.
 5    BY MR. ELLIS:
 6    Q    Take a look in your binder -- let me see if I can refresh
 7    your recollection here.  And if you look under Tab 4 of your
 8    binder, your declaration exists in this case.
 9    A    Yep.
10    Q    The very first one.
11           (Exhibit 4 for identification.)
12    BY MR. ELLIS:
13    Q    And I'm going to draw your attention to your paragraph
14    8 -- or paragraph 9.3.  And I believe we have a reference to
15    "across all products" in there.  Does that refresh your
16    recollection that your price calculation took into account
17    aggregate data over a number of products, not focusing solely
18    on the Serum?
19    A    Oh.  I -- let me just clarify.  So when I look at this
20    data, I see a title that says "Sleek & Shine," for example.  I
21    believe that that is a collection of different UPC's.  And
22    that's what I meant by different products, that it's going to
23    be -- obviously under this heading there's going to be very
24    many UPC's, typically forms -- aggregate those up to get a
25    composite measure.
```

```
1   Q    So you didn't focus solely on the Serum product.  You

2   focused on a collection of products.  Is that a fair statement?

3   A    I -- to be honest, I believe that these were all Serum

4   products.

5   Q    But not just the Serum that's at issue in this case.  Is

6   that what you're telling me?

7   A    What I'm telling you is that the Serum itself I'm assuming

8   has multiple, say, pack sizes or -- so that has to have been

9   aggregated for it to come up with one composite number.

10  Q    Well, let me make sure that you're -- you're being careful

11  here.  Turn to paragraph 29 of your declaration.  And look at

12  the last sentence on page 10 that goes on to page 11.  See if I

13  can refresh your recollection on this particular topic.

14  A    Yep, "at the aggregate annual level."  That's the --

15  Q    Right, for 2005 and 2006.  Did you mean when you said

16  "aggregate level" that it did not isolate the Serum product

17  alone and included information related to other products?

18  A    No.  I just meant that I have only one number here.  I

19  don't have any more than that one number.  So my analysis is

20  based on that one aggregate number from the year 2005.  I don't

21  have weekly data, I don't have monthly data, I don't have

22  various UPC's.  So my analysis is simply based on those

23  aggregate numbers.  That's what I meant by it.

24  Q    You're aware that there was some criticism of your price

25  analysis by L'Oreal's expert Dr. David Nolte.  Were you made
```

```
 1  aware of that?

 2  A     I was made aware of that.

 3  Q     And were you made aware that one of the criticisms is that

 4  you lumped in other products and didn't focus solely on the

 5  Serum?

 6  A     No.  Actually, I -- I never thought of it that way.  I

 7  thought the -- the main criticism was inflation but not -- I

 8  didn't really think about the other product.

 9  Q     You weren't told that another issue with your analysis was

10  the fact that you included products other than the Serum in

11  your price calculation?

12  A     Only recently.  That was a couple of days ago that I was

13  told of that.

14  Q     And did you do anything to determine whether or not you

15  had, in fact, included other products in your analysis, not

16  focus solely on the Serum?

17  A     There's nothing to do.  There is only these numbers that

18  are available, so --

19  Q     So you used the information you had available to you?

20  A     At the time of doing the -- just to be clear, I think of

21  this as just being a fact-checking thing.  It's not any

22  sophisticated analysis that leads to anything at all.  It just

23  simply says that there is a pattern of prices and sales, and I

24  pointed that out.  That's all that is.

25  Q     Well, you actually referred to it as just a little
```

```
1   calculation.  Remember that?

2   A    I did.

3   Q    And what you really said was -- is that you ran this

4   little calculation not to determine whether any pricing

5   increase you observed was attributed to flammability but just

6   as a starting point to determine whether or not it was

7   reasonable to go forward in ascertaining whether your proposed

8   methodologies could be used to reference such an effect?

9   A    That is true.

10  Q    And so you haven't measured any price increase that you

11  have attributed to flammability at this point; right?

12  A    Those are my words, true.

13  Q    And so as far as you know, any increase that you observed

14  in this little calculation, you can't say, as you sit here

15  today, whether or not it has anything to do with removal of the

16  flammability warning; true?

17  A    I cannot.

18  Q    Now, did you get some additional documents that were

19  produced by L'Oreal after your deposition?

20  A    I did.

21  Q    And did you take a look at those documents?

22  A    Not in any detail, no.

23  Q    So you didn't do anything to correct the testimony

24  provided in your deposition or the declaration you filed with

25  this Court in light of those documents that provided additional
```

1    information on product sales; is that right?

2    A    So when the additional documents were sent to me, the

3    question that I was asked was whether or not these documents

4    were sufficient to do the random coefficients demand analysis

5    and I said they were not.  I looked through them.  There wasn't

6    all the data that's needed to do the random coefficient demand

7    analysis, so I didn't.

8         Like I said, I was not -- I wasn't asked to redo my

9    calculation, so I didn't.

10             MR. ELLIS:  Move to strike on the grounds of

11   nonresponsive, Your Honor.

12             THE COURT:  I think it's responsive, but -- I'm

13   going to deny it without prejudice to being renewed.

14   BY MR. ELLIS:

15   Q    Dr. Misra, I want to make sure I ask this perfectly.  You

16   got additional documents with sales data prior to 2007 which

17   didn't aggregate the numbers which you called out as a

18   criticism in your declaration, and you didn't do any further

19   analysis to determine whether or not your little calculation

20   that showed a 39-cent increase in price was mitigated by those

21   documents.  Is that your testimony?

22   A    I'm not sure what you mean by "criticism."  I had no

23   criticism of -- of any -- I'm sorry.  I don't understand.  I

24   didn't criticize --

25   Q    Let me try again and ask a different question because, as

```
 1   I said, I want it to be perfect.  I think we all do.
 2        You got additional documents that related to the prices of
 3   the Serum prior to 2007, and you didn't do anything to
 4   ascertain whether or not that affected your little calculation
 5   that there was a 39-cent increase in price from the period that
 6   the Serum had a warning for when it had no warning; is that
 7   true?
 8   A    I was not asked to do that analysis, and it would not
 9   change --
10   Q    So you didn't; right?
11   A    Can I finish?
12   Q    Well, I thought you did.  But if I interrupted you, please
13   go on.
14   A    So the aggregate numbers, if you -- if the documents that
15   you provided me were consistent, they would have to be
16   consistent with these numbers, it wouldn't change my aggregate
17   analysis anyway.  You know, so on top of that, if nobody's --
18   if I was not asked to redo that analysis, I had no reason to do
19   so.  If you -- if there was a reason to do it and if I believed
20   that that would answer the questions pertaining in this case, I
21   would.
22        None of this answers the question that's being posed in
23   the case.  So there is -- I'm not sure why I would be required
24   to even think about doing it.
25   Q    Well, you said that if you ran your little calculation and
```

1    the answer was there was no price increase whatsoever, you

2    couldn't sit here and advocate for any further work relating to

3    the random coefficient demand estimation model or the conjoint

4    analysis.  That's what you said.  So that's why you would do

5    it.

6              MS. TERSIGNI:  Objection.  Objection.  Misstates the

7    testimony.

8              THE WITNESS:  I'm sorry.  I did not say that.  What

9    I said was -- or I mean to be -- I'm saying even now is that if

10   I had done that calculation and I had found that, you know,

11   there was -- let me go a step back and just articulate what the

12   calculation was for so that you can ask me questions about

13   that.

14        There is -- we know that the flammability warning went

15   into effect in 2007.  We have data on prices and sales for at

16   least two years at an aggregate level across products, all

17   branded.  We have prices and sales there.  We have prices and

18   sales after 2007, when the flammability warning was removed.

19        Let's say -- let's think of what we should expect to see.

20   A flammability warning is a negative product characteristic.

21   So if it's removed, the product could be perceived as being

22   better.  Okay?

23        Now, usually when prices go up, we have something called

24   the fundamental law of demand, which is if prices are higher,

25   demand should fall.  People will buy less; prices are higher.

```
 1       According to my simple calculation, before and after 2007,
 2  prices went up and sales went up.  So I'm not -- again, I can't
 3  make a causal claim here.  But my inclusion -- the reason I did
 4  the calculation was to assure myself there was something to
 5  look at here.
 6       It makes no claim about causality.  It essentially says is
 7  there a fact-checking device here to say, on aggregate, when
 8  prices went up, we saw demand going up.  Therefore, it must be
 9  true that something changed that was -- that people were
10  willing to pay more for or buy more of the product of.  And
11  that's all that calculation did, was -- it doesn't nail down
12  the value of flammability.  It doesn't even causally attribute
13  the price change to flammability.
14       So -- and this was done at the time of when they asked me
15  to, you know, make a statement of whether or not this
16  methodology exists and if it could be implemented.  And at that
17  time, this was sufficient to kind of state in my declaration.
18       After that, I have no reason whatsoever to go and revisit
19  that analysis because, on aggregate, that pattern exists.
20  Whether it exists for every single product, it's not -- it's
21  not -- to me, that's not the issue.  If you want the correct
22  answer here, we'd run the random coefficients demand analysis
23  or the conjoint, and that will give you the answer, not, you
24  know, three numbers in one row of an Excel sheet.
25  ///
```

1  BY MR. ELLIS:

2  Q    Are you finished with your answer?

3  A    Yes.

4           MR. ELLIS:  I'd like to read from the witness's

5  deposition testimony.

6           THE COURT:  Okay.

7           MR. ELLIS:  From page 122, line 11, to page 124,

8  line 11.

9           THE COURT:  Okay.

10          MR. ELLIS:  "QUESTION:  And so at this point, it

11 would be pure conjecture to say that the price went up because

12 the removal of the flammability warning; correct?

13     "ANSWER:  Yes.  I cannot make a statement about the price

14 going up because of the flammability warning.  What I -- again,

15 just to be clear as to what I am saying, I'm saying that the

16 fact the prices went up and sales went up is -- is consistent

17 with the scenario where the removal of the flammability warning

18 was received as a positive characteristic -- or sorry, the

19 removal, that's right, the removal of the flammability warning

20 made consumers see the product differently and act differently.

21 That's all this suggests.

22     "QUESTION:  And that's conjecture on your part?

23     "ANSWER:  Of the data?  No.  That's -- the data's whatever

24 it is.  I'm just saying that what -- if it didn't go this way,

25 I would have no grounds to -- it's essentially ruling out a set

1    of initial hypotheses.  With this data, I can rule out the

2    hypothesis that the removal of the flammability warning had --

3    how do you put this? -- had zero effect.

4         "I can say -- I can't be precise about it, but I can

5    essentially say that if the data -- if these four or five data

6    points weren't the way they were, it would be very difficult

7    for me to sit here and say we should do an analysis because

8    there would be no reason to do it.  But because of the way

9    the -- of this little bit of data -- again, I'm going to be

10   very clear here.  This is very minimal data.  And -- but it

11   does suggest that there is a need to do the full analysis.

12        "QUESTION:  But you cannot rule out that the removal of

13   the flammability warning had zero effect.  You can't rule that

14   out either?"

15        Objection.

16        "QUESTION:  You can't rule out that the removal of the

17   flammability warning has zero effect?

18        "ANSWER:  And I'm not trying to.  My objective here is to

19   essentially state, as I was asked, whether or not there exists

20   methods that would be able to ascertain what the impact of the

21   warning was, and that's all I'm saying."

22   BY MR. ELLIS:

23   Q    Dr. Misra, when you got those additional documents, why

24   didn't you do an analysis to determine whether or not there was

25   no basis to go forward because there was no increase in price

54

```
 1   at all?
 2   A     Because I was not asked to or I did not see any use in
 3   doing so.
 4   Q     Thank you, Dr. Misra.
 5         Now --
 6               THE COURT:  Do you want to finish your answer?
 7               THE WITNESS:  No.  I -- I think I did.  I was just
 8   saying that I was not asked to.  I've said this before.  I did
 9   not -- I was not asked to and I did not see any particular
10   reason to do so.  And -- because the data that -- at this
11   aggregate level can be aggregated up to the same numbers, so it
12   would not change what I had provided in my declaration.
13   BY MR. ELLIS:
14   Q     Are you finished with your answer?
15   A     Yes, I am.
16   Q     Now -- now, with respect to the random coefficient demand
17   estimation model, there is certainly a result that you could do
18   if you ran them all where there was a non-priced product
19   characteristic; is that correct?
20   A     I don't follow the question, sir.
21   Q     Meaning that you could determine that there is a
22   characteristic of a product that doesn't affect the price if
23   you run the model; right?
24   A     I'm sorry.  I don't quite understand the question.
25   Q     Well, the random coefficient demand estimation model
```

```
 1   looked at preferences of characteristics of product, and you,
 2   in running that analysis, could determine that consumers placed
 3   no preference of material level on a particular product
 4   characteristic; right?
 5   A    Oh.  You're saying what -- if I did do the analysis, what
 6   the outcome might be?  No.  I can't speak to that.  But the
 7   data would kind of give you whatever the answer was.  Am I --
 8   I'm not sure I am understanding the question.
 9   Q    It certainly could be my fault.  You're a better expert in
10   this area than I.  So let me try again.
11        If you run the random coefficient demand estimation model,
12   you may very well determine that consumers did not care about
13   flammability at all; right?
14   A    Oh, I see.  So -- yes, it's definitely possible that I
15   will -- I will find an effect that is not significantly
16   different from zero, yes, that's definitely possible.  Depends,
17   again, on the -- whatever the facts of the data are will get
18   revealed in the analysis.
19   Q    You could very well determine that the removal of the
20   flammability warning had no effect on the price of the product
21   whatsoever; right?
22   A    If that's the truth, then that should be what should come
23   out of the analysis.
24   Q    That is one alternative to your analysis; right?
25   A    Yes.
```

```
1   Q    And that remains -- that's what you said at your
2   deposition, and that's what you say today; right?
3   A    Yes.
4   Q    Now, you were made aware of some criticism that
5   Dr. Hanssens had of your -- your analysis in this case; is that
6   true?
7   A    I -- which particular criticism?
8   Q    Well, were you made aware at all whether or not
9   Dr. Michael Hanssens had some criticisms of the work you
10  performed in this case in -- in ascertaining that the random
11  coefficient demand estimation model could be used to value
12  the -- the sale -- the probability of the sale?
13  A    I did go through Professor Hanssens's declaration.  To me,
14  the standout point was not that this couldn't be done or there
15  were issues with the random coefficients demand estimation.  He
16  himself has published -- you know, has been editors on papers
17  that have been published on the topic.  But the fact that it
18  had not been done yet, that's -- my big takeaway from his
19  declaration was that I had not actually done the analysis,
20  which is factually correct.  I had not done it yet.
21  Q    And you know Dr. Hanssens; right?  He's a colleague of
22  yours?
23  A    I do.  I know him well.  He's a good friend.
24  Q    And he's one of the foremost experts in the country in the
25  field of consumer purchase behavior.  You would agree with
```

1  that; right?

2  A     He's one of the foremost experts in the area of

3  time-series analysis.  That's his main area.  And apart from

4  that, he's done some other work.  But his main area of

5  expertise is time-series demand estimation.

6  Q     And consumer purchasing behavior too; right?

7  A     I would say.  I wouldn't call him one of the foremost

8  experts on consumer behavior, but I would definitely call him

9  one of the leading experts on time-series analysis.

10  Q     You remember telling me that he was one of the foremost

11  experts in consumer purchasing behavior at your deposition?

12  A     I don't.  But if you point me to say that he's one of --

13  one of the -- he's definitely an expert in the area.  It's a

14  question of qualification, of whether I would count him as one

15  of the very top leading experts in it.  He's definitely

16  capable.  So let's not argue --

17  Q     Yeah.  I don't think we need to split hairs.  I apologize.

18  I just want to be clear about that.

19       And Dr. Hanssens -- were you made aware that one of his

20  criticisms is that you don't have the type of data that you

21  need to run a coefficient demand estimation model and that you

22  couldn't get it at all?

23  A     Yes.  I -- I was made aware of that.

24  Q     Okay.  And you would agree with the premise, certainly,

25  that if you don't get the data, you can't run the random

```
 1   coefficient demand estimation model; right?
 2   A     Yes.
 3   Q     Just -- I just want to make sure you -- go ahead and take
 4   a sip.
 5         And if that happens, the only thing you're left with is
 6   the conjoint analysis, the consumer survey; right?
 7   A     Yeah.  If there's no data to do the random coefficients
 8   demand analysis, then yes, the only approach to doing it is
 9   conjoint.
10   Q     Now, based on all the information you have today,
11   including the information you got after the -- your deposition
12   that you were asked by counsel to review, you don't have the
13   information you need to do a random coefficient demand
14   estimation model; right?
15   A     I don't have it, but I believe it exists.
16   Q     Well --
17   A     I've said that before.
18   Q     Yeah.  You don't have it; right?
19   A     I do not have it right now.
20   Q     Okay.  And you've not ever seen it; right?
21   A     No.
22   Q     For this product, you haven't seen it?
23   A     I haven't seen it.
24   Q     Now, you would -- you are aware that the product changed
25   at the same time that the -- the warning came off; right?
```

1    A     I was told that it did, yes.

2    Q     And so you would agree that the color of a bottle is a

3    feature of the product; right?

4    A     I would.

5    Q     And you would agree that the type of spout it uses is a

6    feature of the product; right?

7    A     It is.

8    Q     And you would agree that the smell of a product is a

9    feature of the product?

10   A     I agree.

11   Q     And you would agree that the shape of the bottle of the

12   product -- is a feature of the product?

13   A     I agree.

14   Q     And so with all those things changing at the same time,

15   while you believe you can run the RCDE model, you cannot say

16   definitively as you sit here today whether or not there would

17   be sufficient variation in data to tell you whether or not the

18   removal of the flammability warning had any impact on the

19   price; is that right?

20   A     This is where Professor Hanssens and I disagree.  So the

21   idea here is that if you take one particular product and a

22   number of things changed for that product, can we isolate the

23   effect of one particular element, which is the flammability

24   warning?  And you can, in the sense that there are also

25   competitor products that have flammability warnings and that

1   don't that may have a particular color, that may have a

2   particular shape, and so you don't need variation within one

3   product.  What you need is variation across products to nail it

4   down.

5        To give you an example, a lot of the analysis that's done

6   to estimate product features in actual data, the product

7   feature never changes.  It's a fixed feature, yet we are able

8   to ascertain what the -- how consumers value, say, the

9   mushiness of a cereal or the sweetness of the taste, even

10  though for a given product that characteristic never changed.

11       The reason we can do that is because there's variation

12  across products and possibly in the variation across time over

13  products for competitors that, by looking at how people change

14  their preferences in terms of their choices over time, you can

15  then figure out how they -- how they evaluate one particular

16  characteristic.

17       One other issue, which is a number of things could change

18  for the product.  That's why we have an error done.  As long as

19  they don't happen to directly influence the -- the flammability

20  warning, there's going to be variation across product.  So even

21  if the variation doesn't exist within L'Oreal's product, as

22  long as it exists someplace in the data set, it's enough to

23  estimate the model.

24            MR. ELLIS:  I'd like to read from the witness's

25  deposition transcript, from page 84, line 24, to page 86,

```
 1   line 7.
 2             THE COURT:  You may.
 3             MR. ELLIS:  "QUESTION:  So here's where I'm
 4   confused, and maybe you can help me and then maybe I can ask a
 5   better direct question.  The product has a number of
 6   characteristics pre-2007.  Do you understand that?
 7        "ANSWER:  Yes.
 8        "QUESTION:  Post-2007, the product has a number of
 9   characteristics that include the fact or disclude, however you
10   want to put it, that it doesn't have a flammability warning but
11   the product changed overall its shape, its -- the color of the
12   bottle, the ingredients, the use of alcohol versus the non-use
13   of alcohol.  Can you still -- under that scenario with all
14   these multiple factors being changed at the same time that the
15   flammability warning comes off the product, can you still run
16   the random coefficient demand estimation model to determine
17   whether or not the removal of the flammability warning itself
18   caused any effect on the price?"
19        There's an objection.
20        "ANSWER:  My answer to your specific question is yes, I
21   can still run the analysis.
22        "QUESTION:  And you -- and can you determine through that
23   analysis whether or not the removal of the flammability warning
24   had any impact on price?
25        "ANSWER:  That would be the purpose of the analysis.
```

1    Again, without knowing what the data is and what the variation

2    of the data is, I cannot tell you what the result of the

3    analysis would be.  I cannot -- you know, that's -- that's

4    conjecture."

5    BY MR. ELLIS:

6    Q    Now, Dr. Misra, with respect to the conjoint analysis, you

7    would have to determine the number of effects you're seeking to

8    analyze.  Is that a fair statement?

9    A    You would have to -- you would have to pick the set of

10   attributes that you were to analyze, yes.

11   Q    And you would need a certain number of people to analyze

12   each one of those attributes; is that correct?

13   A    Not each one.  You would need a sample of people who would

14   be asked to make choices across a set of products, and we'd

15   record what products they chose.

16   Q    Well, didn't you tell me, I think, at your deposition that

17   you thought you would need 50 consumers per effect?

18   A    Yes.  That's, again, not for the conceptual part but for

19   the estimation.  If you have enough data per effect, that's --

20   the more data you have, the more precise your estimates get.

21   So a rule of thumb is about 30 to 50 observations per effect

22   that you're trying to estimate.

23   Q    And if you were trying to measure ten separate effects,

24   you would need 500 respondents; right?

25   A    If you were trying to estimate them, the suggested rule is

**UNITED STATES DISTRICT COURT**

1   to have about 500.

2   Q    And one of the limitations of the conjoint analysis is

3   that it only relies on consumer preferences and not actual

4   buying and sales data; is that correct?

5   A    That's true.

6   Q    And there is also false information that can be obtained

7   if you ask open-ended questions that are not precise in the

8   information you elicit; is that correct?

9   A    That doesn't apply here at all.  The conjoint analysis has

10  no open-ended questions whatsoever.

11  Q    Right.  You're going to use the conjoint choice; is that

12  right?  I think you called it a choice, conjoint.

13  A    Actually, any conjoint analysis would be a metric system,

14  so there would never be an open-ended question.

15  Q    Okay.  But you have to formulate the questions properly?

16  A    Yes.

17  Q    And you haven't told us what those questions are because

18  you haven't started to run the process; right?

19  A    That's right.  I haven't set the survey up.

20  Q    Okay.  Now, after you run all of these, whether it be a

21  conjoint or random coefficient demand estimation model, you

22  would need to do a T-test to determine whether or not the

23  information you got was statistically significant; right?

24  A    Whether or not the effects were statistically significant

25  or not, yeah, you would have to do some kind of a test.

```
 1   Q    Right.  So at this point, as you sit here today, you
 2   haven't done anything to determine whether or not there's been
 3   any increase in price as a result of the removal of the
 4   flammability warning; right?
 5   A    I've said that before.  I haven't done any analysis yet.
 6   Q    And you would need to run either the random coefficient
 7   demand estimation model or conjoint analysis to make that
 8   determination; right?
 9   A    That's true.
10   Q    And then after you did all of that, you don't know one way
11   or another, as you sit here today, whether or not there would
12   be shown an increase in price or not; right?
13   A    That's the purpose of running the analysis again,
14   because --
15   Q    And even --
16   A    -- we don't know the answer.
17   Q    I'm sorry.
18        And even if you did run the analysis and it turned out
19   that there was an observed increase in price after the
20   flammability was removed, you would still need to run a T-test
21   to determine whether or not that observation was statistically
22   significant; is that correct?
23   A    Yes.  In order to kind of ascertain whether -- the
24   precision of the estimate, you would do some kind of test and
25   report the results of the test.  It's fairly standard
```

**UNITED STATES DISTRICT COURT**

1    procedure.

2    Q    So as you sit here today, if the damages in this case are

3    an increase in price without the flammability warning for this

4    particular product, you have not made any determination one way

5    or another whether or not those damages exist; true?

6    A    I have -- again, I have not done the analysis, so I cannot

7    say anything about what might happen after the analysis was

8    done.

9    Q    Thank you, Dr. Misra.

10             THE COURT:  Any redirect?

11             MS. TERSIGNI:  Yes, Your Honor.

12             THE COURT:  Okay.  Very well.

13                    **REDIRECT EXAMINATION**

14   BY MS. TERSIGNI:

15   Q    Based on your experience, Dr. Misra, is there anything you

16   would want to add to your testimony today?

17             MR. ELLIS:  Objection.  That's a narrative.

18             THE COURT:  It is a narrative.

19             MS. TERSIGNI:  Okay.

20   BY MS. TERSIGNI:

21   Q    Is it difficult, in your opinion, to conduct a conjoint

22   analysis?

23             MR. ELLIS:  Objection.  That's leading.

24             THE COURT:  She can lead an expert.

25             THE WITNESS:  No.  So conjoint has, like I said

**UNITED STATES DISTRICT COURT**

```
 1   before, a long and storied history.  It's a fairly standard,

 2   simple approach to doing it.  There might be some resources

 3   involved depending on how many -- like, how many individuals

 4   you want to sample to get the analysis robust enough.  And --

 5   but no, there's nothing -- nothing complicated about doing it.

 6   It's routinely taught to graduate students.  It's -- you know,

 7   and there exists ways of doing it that are fairly automated.  A

 8   number of firms will do this for you.  So it's fairly easy to

 9   do.

10   BY MS. TERSIGNI:

11   Q    And Dr. Hanssens testified that he was able to determine

12   the value -- are you aware that Dr. Hanssens testified that he

13   was able to determine the value ascribed by consumers to a GPS

14   function on a Smartphone?

15              MR. ELLIS:  Objection.  Hearsay.  Beyond the scope.

16              THE COURT:  Overruled.

17   BY MS. TERSIGNI:

18   Q    Are you aware?

19   A    Yes.  I was made aware in his statements that he had

20   talked about the -- about his work in estimating the effect

21   that consumers placed on GPS capabilities in tablets, I

22   believe.

23   Q    And does that surprise you, that he was able to do that,

24   to perform that analysis?

25   A    Not at all.  Like I said, I think this is -- this is a
```

1    fairly standard practice.  It's been -- it's been used to

2    evaluate product characteristics.  In fact, that's the

3    objective of conjoint analysis, is to evaluate product

4    characteristics sometimes even before the product has been

5    introduced so that you can get an idea of what prices to charge

6    and what people are willing to pay for different product

7    attributes.  It doesn't surprise me at all that he's been able

8    to do that.

9              MS. TERSIGNI:  No further questions.

10             THE COURT:  Okay.

11             MR. ELLIS:  Nothing further, Your Honor.

12             THE COURT:  Okay.  I just have one question that I'm

13   trying to understand.

14        With regard to the random coefficient demand estimation

15   analysis, you've indicated that there is data that you would

16   need -- and we talked about the scanning data -- to perform

17   that analysis.

18        My question is:  For the random coefficients demand

19   estimation analysis to be a method for proving class-wide

20   damages, don't you first have to determine the existence of the

21   data in question?

22             THE WITNESS:  So I'm -- I'm not an expert on the

23   legality of things.  So -- but to the best of my knowledge,

24   this data does exist.

25             THE COURT:  I understand.  That's -- that's what

1   you've said, but obviously there is a contention that it

2   doesn't exist or that you can't get it.

3        And my question to you is:  Is the -- does that data

4   existing have to -- or does that data have to exist as a

5   precondition of your ability to do the random coefficients

6   demand estimation analysis?

7            THE WITNESS:  That's true.  The data has to exist.

8   The reason why I believe it exists is, like I said in my

9   deposition, I saw the stamps from IRI.  So, for example, in

10  Exhibit 3-D, ones that counsel was showing me, the data is

11  coming from IRI.  And if the data is sourced to IRI, that

12  essentially means that they have this data.  This data does

13  exist, and these reports are being furnished to L'Oreal on a

14  continuing basis.  So that makes me believe that they have the

15  data available to them.  It's just that I don't have the data

16  to do the analysis.

17           THE COURT:  Okay.  That's all I have.

18      Okay.  You may step down.

19           THE WITNESS:  Thank you.

20           THE COURT:  Okay.  Are you going to call your expert

21  today or --

22           MR. ELLIS:  Yes, Your Honor.  I'd like to call

23  Dr. -- Mr. David Nolte.

24           THE COURT:  Okay.  Why don't we just take a short

25  recess.  Do you have --

1          MS. TERSIGNI:  Your Honor, I have an objection to

2     calling the witness.  I -- plaintiffs' counsel was not advised

3     that the witness would be appearing at this court appearance.

4     The witness did not provide any reports in this case, any

5     signed declarations, or any official reports.  It's not

6     pursuant to any schedules.  We were not advised that this --

7          THE COURT:  Well, that's problematic.  I guess my

8     bigger problem is that what we're here to do is to look in

9     isolation at the methodologies employed by the plaintiffs'

10    witness.  And it seems to me more appropriate to call your

11    witness if, in fact, I determine the admissibility of

12    Dr. Misra's testimony.  And -- and when I say if I determine --

13    that it's admissible, what I'm really saying is when we get to

14    a trial, if I think it's admissible, it's going to be offered

15    to show what you perceive to be the defects in his testimony.

16      So I'm not sure that it helps -- it advances the ball

17    today, particularly if plaintiffs' counsel hasn't been advised

18    that he would be called.

19          MR. ELLIS:  Well, on the procedural issue,

20    Your Honor, you asked who would I call on our precall --

21          THE COURT:  I did.

22          MR. ELLIS:  -- and I said I would call Dr. David

23    Nolte.

24          THE COURT:  I think you indicated that you might.

25    You didn't say you would, but that's neither here nor there.

1    You certainly said you might call him.

2           MR. ELLIS:  I -- okay.  I thought I said I would,

3    and I actually said I would call Dr. Hanssens as well.

4        And actually, we did provide counsel with some deposition

5    testimony as to Dr. Hanssens that we intended to read this way.

6    So they knew we were going to call additional witnesses as

7    well.

8        We also gave them an exhibit list last night that had

9    Dr. Nolte's exhibits on it.  So to claim surprise is -- is

10   surprise to me.  But --

11          MS. TERSIGNI:  Your Honor?

12          MR. ELLIS:  May I finish?

13       And in addition to that, Your Honor, no expert has

14   provided any expert report in this case.  And Dr. Nolte -- or

15   Mr. Nolte was deposed in this case, and he did provide all the

16   testimony supporting his opinions.

17       I think the Court could benefit, at least from the issue

18   of -- of the price comparisons.  There was one issue that

19   wasn't dealt with.  And if the Court is not inclined to hear

20   Mr. Nolte's testimony, I'd like to recall Mr. Misra --

21   Dr. Misra real quickly to cover one point that was not allowed

22   to be covered.

23          MS. TERSIGNI:  Your Honor, at no time did defense

24   counsel advise plaintiffs' counsel that they would be calling

25   David Nolte as a witness.

UNITED STATES DISTRICT COURT

1          We received an exhibit list late last night, maybe, like,

2     sometime in the evening.  And I did not believe that he

3     would -- that they would be calling him as a witness.  I

4     believed that those exhibits would be used for Dr. Misra.  So

5     this is -- this is -- this is a surprise to us.

6          Also, if -- if L'Oreal's counsel would like to submit

7     testimony of David Nolte, he already was deposed.  He can do --

8     they can do the same thing as they did for Dr. Hanssens.  I

9     don't see why there's a difference here.

10          THE COURT:  Well, look, here is the problem.  I -- I

11     don't even recall your mentioning Mr. Nolte on the telephone.

12     You certainly did mention Dr. Hanssens, that you might call

13     him.  Maybe the cleanest way of doing this is just to recall

14     Dr. -- Dr. Misra and ask him whatever you want to ask him and

15     go from there.

16          MR. ELLIS:  I -- I think it's unfortunate the Court

17     won't have the benefit of that testimony, but I'm at the

18     Court's pleasure in that regard.  We call Dr. Misra.

19          THE COURT:  Okay.

20          THE COURTROOM DEPUTY:  Sir, I just remind you that

21     you're still under oath.

22          THE WITNESS:  I understand.

23     ///

24     ///

25     ///

1    <u>**SANJOG MISRA, Ph.D., DEFENDANTS' WITNESS, PREVIOUSLY SWORN**</u>

2                         **DIRECT EXAMINATION**

3    BY MR. ELLIS:

4    Q    Dr. Misra, you recognize you're still under oath; correct?

5    A    I do.

6    Q    And you were made aware of some criticisms that Dr. Nolte

7    had of your work.  And I think you mentioned inflation was one

8    of them; right?

9    A    That's right.

10   Q    And so when you did your analysis, you did not account for

11   the impact of inflation on the little calculation you did which

12   showed an increase in price of 39 cents; is that right?

13   A    That's correct.  I did not.

14   Q    And so you don't know, as you sit here today, whether or

15   not accounting for inflation would make that price increase you

16   saw nil; right?

17   A    There is a reason why I didn't account for inflation.  And

18   that reason happens to be that if you think about -- so my

19   research and my approach to doing analysis stems from what I

20   call a structural approach, trying to boil it down to how

21   consumers would make decisions.  So the question to ask is:  Do

22   consumers -- when they go into a supermarket to buy a product,

23   do they take the price of the product and deflate it by some

24   CPI measure?  No, they don't.  They look at the nominal price

25   of the product, not the CPI-adjusted or inflation-adjusted

```
 1   price.
 2        So between 200- -- unless I believed that there was some
 3   massive shift between 200- -- you know, prior to 2007 and
 4   post-2007, I have no particular reason to believe that
 5   consumers changed the way in which they perceived the price of
 6   the product.  That's why I didn't -- I didn't account for
 7   inflation in there.
 8   Q    There was -- there was a massive shift.  There were -- the
 9   price went up based on your calculation in this little
10   calculation you did by 8 percent over a two-year period of
11   time.
12   A    That -- what I -- that's exactly right.
13   Q    And so --
14   A    Can I finish my answer?
15   Q    Oh, I'm sorry.
16   A    So you're exactly right.  That's not what I meant by
17   "massive shift."  Not on the part of the effective price that
18   was being charged for the product in the stores.  What I'm
19   talking about is whether or not consumers perceived there to be
20   a different wealth effect.  So the reason to adjust it by --
21   for inflation is if you believe that the consumers' worth or
22   budget constraints relative to this particular product changed
23   dramatically, the reason we don't take those wealth effects
24   into account is because in terms of CPG products, in terms of
25   grocery products, there's tons of evidence to say -- it's not a
```

1    car, it's not a house, which is hugely impacted by -- by budget

2    constraints.

3         Small products like hair care products or grocery or

4    shampoo or soap, people tend to look at the price on the shelf

5    and make a decision.  And they don't tend to deflate it by the

6    inflation factor.  That's all I'm saying.  So there was no

7    particular reason for me to do it, and that's why I didn't do

8    it.

9    Q    There was a reason for you to do it, and that was because,

10   as you said, you couldn't sit here and advocate the use of the

11   random coefficient demand estimation model or the conjoint

12   analysis if there was no shift in price, the effective price of

13   the product.

14              MS. TERSIGNI:  Objection.  Argumentative.

15              THE COURT:  Overruled.

16        You may answer.

17              THE WITNESS:  So let's take -- let's take another

18   example here.  For -- I was also told when you brought this up

19   and it was in the -- and it was provided to me many times, the

20   suggested retail price for the product never changed between

21   prior to 2007 and after 2007.

22        Now, if I take it at face value, I would say, well,

23   there's no change in price whatsoever.  However, the -- the

24   fact of the matter is that what matters is the price that's

25   facing the consumer.  So I ignore the -- the suggested retail

```
 1   price for the same reasons I ignore inflation.  What matters is

 2   the price that the consumers saw on the shelf at that point,

 3   and that price is what I took into account.

 4        Now, if -- and when I say that that -- when I said that

 5   the price went up, it's not inflation-adjusted price.  It's the

 6   price that the consumers saw on the shelf that went up.  And to

 7   the extent that I believe that consumers do not sit there and

 8   do this calculation of inflation adjustment in their head, I

 9   would actually argue that using that price would be wrong.

10   It's not the price that consumers deem to be relevant in making

11   their decision.  And why would I -- for -- I would be doing

12   myself a disservice if I took that price into account.

13   BY MR. ELLIS:

14   Q    Well, what you want to know when you look at a price and

15   compare it from 2005 to 2008 is whether or not the consumers'

16   buying power is the same at that precise moment.  And so if the

17   CPI index shows that milk is 13 percent more, that saltines are

18   13 percent more, that shampoo is 13 percent more, that hair

19   conditioner is 13 percent more, and, ta-da, Serum is 13 percent

20   more, that when they looked at the price in 2008 and they saw

21   the 13 -- the 8 percent increase you saw, they themselves said

22   same price.  That's why you would do it.

23   A    No.  That's not why I -- I did not do it.  And if you even

24   take your argument into account and if people really believe

25   that their arguing for the price going up was the fact that
```

76

```
 1   there's inflation -- let's assume that argument.  Now you would
 2   have to say that there was inflation that caused sales to go
 3   up, which makes even less sense.
 4        If the prices are going up for not anything to do with the
 5   product, then by the same token, how do you rationalize the
 6   fact that sales went up when these prices went up for -- for
 7   non-product related features?
 8        If you want -- if you want my argument to be consistent
 9   or -- you have to argue it out.  Either you take the
10   inflation-adjusted prices or you don't.  If you say that prices
11   went up because of inflation, then you have to attribute sales
12   to inflation, which is -- which doesn't make any sense.
13   Q    That's not really the point, though.  The point is that if
14   you, as you said, to begin your analysis, are going to
15   determine whether or not you should go forward and opine that
16   there are methodologies that should be used to further answer
17   the question, you need to know whether or not there was a true
18   increase in price and you didn't use inflation or --
19   A    I'm --
20   Q    Can I finish my question?
21   A    All right.
22   Q    You didn't apply inflation and a matrix to ascertain that
23   before you, as you said, sat here and said use random
24   coefficient demand estimation -- well, I'm on conjoint now.
25   That's a true statement; right?
```

```
 1   A     It is true, and I agree today.  I think it's wrong.  This
 2   is not an accounting practice.  This is an issue of, in my --
 3   my professional opinion, how consumers make decisions.
 4        I do not believe and I will not believe that consumers sit
 5   there in front of a shelf looking at different products and do
 6   an inflation adjustment.  They -- they do not do that.  And so
 7   if I don't believe that, I don't -- I cannot in good faith
 8   adjust for inflation unless I believe that that inflation in
 9   some major way has handicapped the product and they actually
10   change their beliefs about how this price is set up.  And I
11   don't believe that; therefore, I don't think that should be
12   using inflation.
13   Q     Dr. Misra, you certainly are sitting here today and saying
14   that if the price went up solely because of inflation by
15   8 percent and that is the spread you observed in 39 cents, that
16   that is the damages in this case that the class is entitled to.
17   You're not saying that, are you?
18   A     Well -- and I said that repeatedly.  Again, I'll
19   reiterate.  The -- that calculation was never done to causally
20   link the flammability warning to the price increase.  You asked
21   me that in the deposition.  You've asked me that a few times
22   today, and I will repeat.  Completely clearly, this analysis
23   was not done to answer that specific question.
24        This analysis was simply to suggest that for my own
25   personal beliefs, is there enough -- any evidence whatsoever to
```

```
 1   move forward?  And to me, there was belief -- enough evidence
 2   to move forward.  That's all.
 3   Q    And because you haven't applied the CPI index to determine
 4   the effect of inflation on the price of the product, you do not
 5   know, as you sit here today, whether or not all of the spread
 6   you saw is attributed to inflation; correct?
 7   A    Again, I've said -- I've answered your question, which is
 8   I don't believe that that's the right approach to doing it.
 9   Why would I do something that I believe is wrong?
10   Q    Focus on my question, Dr. Misra.
11             THE COURT:  You know --
12             MR. ELLIS:  Oh, I'm sorry.
13             THE COURT:  I -- what he is saying, he doesn't think
14   inflation should be part of a regression analysis.  You
15   obviously disagree.  It seems to me that that is a subject for
16   the trial and not a subject necessarily for today's discussion.
17             MR. ELLIS:  Well --
18             THE COURT:  But maybe we can get an answer to it one
19   more time; although, we've had an answer five times previously.
20             MR. ELLIS:  I'm sorry, Your Honor.  If you have the
21   answer, you're the one making the determination, I'll rest on
22   that.
23        Thank you, Your Honor.
24             THE COURT:  Okay.  Anything further?
25             MS. TERSIGNI:  Yes, Your Honor.
```

```
 1              THE COURT:  Okay.
 2                        CROSS-EXAMINATION
 3   BY MS. TERSIGNI:
 4   Q     Dr. Misra, are you aware that L'Oreal kept the suggested
 5   retail price of Serum at the same price before and after the
 6   flammability warning was removed?
 7   A     I was informed of that, yes.
 8   Q     How does that affect the demand analysis in terms of
 9   consumers' willingness to pay for Serum with or without the
10   flammability warning?
11   A     It doesn't.  So to think about -- to think about, once
12   again, what do consumers care about?  They care about the
13   retail price that they are faced with.
14         L'Oreal could keep their suggested retail price the same.
15   That does not mean that the effective price that the consumer
16   had to pay did not go up.  In this case, at least from the
17   preliminary analysis, it seems that at least a trend of what's
18   moving up.  You can quibble about how much that was.
19         The fact of the matter is what's relevant is the final
20   retail price.  And the suggested price by L'Oreal clearly in
21   this case -- I mean, if we believe that it remained flat, that
22   doesn't explain why the retail prices changed.
23         The other thing to keep in mind is if you take the product
24   characteristic like flammability out and you believe that that
25   enhances the product, which it should, then even keeping the
```

```
 1    price the same, essentially you have increased the value of the
 2    product.  Right?  And that might percolate down to the retail
 3    price.  Once that realization hits that consumers value the
 4    product more, retailers can adjust the price upwards.  And
 5    that's something that we have to -- if we have more data, we
 6    can go into.
 7              MS. TERSIGNI:  Thank you.  No further questions.
 8              THE COURT:  Anything further?
 9              MR. ELLIS:  I mean -- no.
10              THE COURT:  Okay.  You may step down.
11              THE WITNESS:  Thank you, Your Honor.
12              THE COURT:  I do have to say that if you want to
13    call Dr. Hanssen -- or Hanssens -- I'm sorry.  That, I'm clear
14    that you did say when you were last here when we talked on the
15    phone, that you might well do that.  I'm not sure it's
16    necessary to what we're doing here today, but I think that
17    there was at least notice that you intended to -- that you
18    might call him.
19              MR. ELLIS:  Your Honor, we would read his deposition
20    transcript.  I --
21              THE COURT:  That, I have.
22              MR. ELLIS:  Right.  And we filed that.
23         Can I confer with counsel?
24              THE COURT:  Sure.
25              (Off-the-record discussion between counsel.)
```

**UNITED STATES DISTRICT COURT**

1          MR. ELLIS:  We won't call Dr. Hanssens.  Through his

2  transcript, Your Honor.

3          THE COURT:  I couldn't hear you.

4          MR. ELLIS:  We won't call Dr. Hanssens.  Through his

5  deposition transcript, Your Honor.

6          THE COURT:  Okay.  So we'll just use his transcript.

7  You'll submit it.  And to the extent I need it, I will rely on

8  it.

9      Okay.  Here is, I guess, the remaining and lingering

10  question.  We do have the defendants' motion to decertify.  We

11  do have, obviously, the plaintiffs' motion.  I think that

12  there's enough in the record for me to decide everything.  But

13  on the other hand, I know that no one in this case is shy about

14  wanting to argue things again and again.

15      I will tell you that my current view, having read the

16  papers, is that I do not agree with the defense argument as to

17  reasons -- as to decertifying the New York class.  I do need

18  some time to think about the testimony that -- at least

19  provided today and whether, in fact, it is sufficient for the

20  California class to be certified.

21      I think you've argued everything on the papers.  I don't

22  know if you want us to proceed -- I guess I could do two

23  things.  One, I could proceed to write an order and present it

24  to you as a tentative so that you can come back and argue at

25  that point in time or we could hear argument today.  You tell

```
 1  me what would make more sense.
 2          MS. TERSIGNI:  Your Honor, plaintiffs' counsel
 3  thinks that a tentative ruling would make more sense and we can
 4  argue from the tentative so that we could know where the Court
 5  stands.
 6      With the exception that plaintiffs' counsel has two
 7  additional -- Your Honor asked for -- on the last call asked
 8  for instances where these -- the RCDE was admitted in
 9  litigation and used for class certification.  And plaintiffs'
10  counsel has two cases, if it could submit those.  Whether it
11  would be electronically or in open court, that's --
12          THE COURT:  Well, certainly you should submit the
13  cases.  Do you have them here today?
14          MS. TERSIGNI:  I have my own copy here today.
15          THE COURT:  Okay.  Well, why don't you lodge the
16  cases.  And then I suppose the problem will be, I'm sure, that
17  Mr. Ellis will want the opportunity to argue why those cases do
18  not provide a basis for the use of these models in this
19  particular case.  But why don't we -- why don't you lodge --
20  actually, just file -- file something with the two cases
21  attached.  Serve defense.  And I'll look at them and see.  And
22  I suppose --
23          MS. TERSIGNI:  Are you saying file them with or
24  without argument?
25          THE COURT:  I'm sorry?
```

1          MS. TERSIGNI:  Are you just saying to file the case

2     without argument?  Is that what you're asking?

3          THE COURT:  If you want to file with argument, I'll

4     let you have ten pages of argument.  But then Mr. Ellis is

5     going to have the like amount of time and pages to respond why

6     they aren't analogous.  But I want to get that done fairly

7     quickly because I want to get these motions decided in the next

8     30 days.

9        So when can you file whatever you're going to file?

10         MS. TERSIGNI:  By the end of the week.  Within a

11    week.  Within a week.  Is that fine?

12         THE COURT:  Within a week.  Well, today is

13    June 16th.

14         MS. TERSIGNI:  By Monday?

15         THE COURT:  Monday will be fine.

16       And then, Mr. Ellis, you would have to the following

17    Monday to respond.  But no brief will exceed 10 pages.  And we,

18    in the meantime, will work on a tentative and get that to you

19    so that we can get this matter argued.  My thought would be in

20    the third week of July.

21         MS. TERSIGNI:  I'm sorry?

22         THE COURT:  In other words, a hearing on class

23    certification in the third week of July.

24         MS. TERSIGNI:  Third week of July.

25         THE COURT:  That's the second week.  I'm at the

 1  Ninth Circuit judicial conference that week, but the week I
 2  come back.
 3          MR. ELLIS:  Assuming that the Court is going to put
 4  this on its normal law and motion calendar, might I suggest
 5  August 4th?  Because I have two conflicts on the -- one on the
 6  21st and one --
 7          THE COURT:  I would like to cooperate, but I think
 8  what we'll have to do is set it on a different day of the week,
 9  because I do want to wrap this up.
10      So do you have a date in the third week of July, assuming
11  that's the --
12          MR. ELLIS:  But the entire third week of July,
13  unfortunately, I'm up in the Bay area on another case.  The
14  following week, I have Wednesday the 30th, Thursday the 31st,
15  and Friday the 1st.
16      Your Honor, I can do an argument now and -- and tell you
17  what my few points are, and then Ms. Murray can argue the
18  motion on another day if you want to set it.
19          THE COURT:  That's fine.  That's fine.
20          MR. ELLIS:  May I just make a couple brief comments?
21          THE COURT:  Absolutely.
22          MR. ELLIS:  Thank you, Your Honor.
23      Your Honor, I think that Dr. Misra said it best, is if
24  there's no change in price, then there's no reason to opine
25  that any demand estimation model or conjoint analysis should be

1    performed.  And as we sit here today, plaintiffs have not

2    proven after three years that there's been any change in price

3    based on the removal of the flammability warning.  Dr. Misra,

4    their designated expert, specifically said that.  There's not

5    one penny, not one cent, not one miniscule amount of money

6    after three years of litigation that they can say was

7    attributable to the removal of the flammability warning.

8         So the additional cases that they plan to provide, the

9    suggested RCDE that has been used in litigation are really

10   irrelevant until we make that first question.  Perhaps in my,

11   whatever it was, 45-minute cross-examination I didn't ask as

12   pointedly the question as you asked, Your Honor, which is until

13   you know the data is out there, should you even begin the

14   analysis?

15        Well, until you know that there's been some basis to

16   determine that there's been some increase in price, you don't

17   begin the analysis.  We do not have, as we sit here today,

18   after the extraordinary step of giving a *Daubert* hearing and

19   letting their expert testify and try and clarify himself, that

20   there's one cent that's attributable to the -- to the removal

21   of the flammability warning.

22        Importantly, although the Court did not hear from

23   Dr. Nolte, we definitely provided his deposition testimony on

24   this case.  And I hope the Court will consider that on this

25   motion.  He says that you have to account for inflation or else

1    you don't know whether or not the prices increased at all.  We

2    all know that.

3        I mean, a gallon of gas is a gallon of gas.  It's one

4    price one day, it's got another price the next day.  It can be

5    50 cents over a month, but it's still a gallon of gas.  And no

6    matter what is in that pump coming out, you buy it based on

7    what's in the pump coming out.  And the price isn't really

8    effective.  It's just effective prices in demand.

9        That's the same thing here with the Serum, Your Honor.  We

10   cannot say that there was anything done in relationship to the

11   removal of the flammability warning that caused any price

12   increase at all.  Until we make that determination, we

13   certainly cannot satisfy and certify a class under *Comcast* for

14   the California class.

15       Now, I know that the Court has indicated that it is

16   inclined to disagree with us on the New York class.  And I know

17   that the Court's basis for that is that there is a statutory

18   damage for that.  And I just ask the Court to think about this

19   again.  We're here three years later.  We've had their expert

20   testify.  He can't say that one cent is attributable to the

21   removal of the flammability warning.  To say that we have to

22   pay $50 per consumer where they can't show that one cent is

23   attributable to the removal of the flammability warning is --

24   is not what the New York General Business Law requires.  It

25   requires an injury before you can apply the $50.

1     They haven't proven it at all.  They haven't even

2  established, as *Comcast* requires, the damages could be

3  determined on a class-wide basis.  Why have they not determined

4  that or why have they not shown that?  Because they haven't

5  shown that there's been any damage at all.

6     When I first argued in this case the very first time that

7  they should have to show in their Complaint on the motion to

8  dismiss what their damage theory was and how they were going to

9  do it, the Court said, no, they don't have to do that.  And we

10  lost.

11     When I said at the very first class certification hearing

12  that they have not shown that there's been any damage suffered

13  by the class at all because the prices remained constant

14  throughout and we relied on the testimony of Kat Peeler, the

15  Court said, no, not now.  You lose.

16     In the interim, we got guidance from the United States

17  Supreme Court.  It changed the landscape.  The answer is they

18  do have to show it on class certification that they could

19  determine on a class-wide basis how damages would be awarded.

20     The first step in that analysis, Your Honor, is to

21  determine that there has been a damage suffered.  In our

22  testimony from their expert, there's not one shred of evidence

23  in the record that a damage has been suffered.

24          THE COURT:  I'm going to stop you there.  I agree

25  that *Comcast* makes clear that there has to be a method of proof

1    that is consistent with *Daubert* that shows that class-wide

2    damage has been suffered.  I don't believe that it goes as far

3    as saying that you have to show the existence of that injury at

4    the class certification stage.  So tell me what in *Comcast* you

5    are relying on.

6              MR. ELLIS:  Well, *Comcast* certainly says that you

7    have to show a manner in which damages can be ascertained on a

8    class-wide basis.  Some of the cases that came after that, in

9    particular, *In Re: Rail Surcharge Freight* case, the expert,

10   what did he do?  He offered two analyses of which he didn't say

11   which one should apply, and he said that one would measure

12   damages one way and one would measure damages the other way.

13   The Court rejected that, saying he had to specifically say what

14   was the proper way to use it and what would be the proper way

15   to ascertain the damages in that particular case.

16        And so *Comcast*, to me, is fairly read to say that not only

17   are we going to not certify a class if you can't tell us how we

18   will do it in the end at the time of trial, it can't -- we

19   won't let you get there unless you can tell us that there is an

20   amount of damages that will be suffered.

21        And that is clearly what the cases that have come after

22   that say, in particular *In Re: Rail Freight Surcharge*.

23              THE COURT:  Some have, some haven't, but I

24   understand that we may have a parting of the ways on that

25   issue.  But I understand your position.

1          MR. ELLIS:  And you do understand, Your Honor,

2     because I've read some of your opinions following *Comcast*.  And

3     you have been, some might say, in the forefront of applying

4     *Comcast* to cases that have come since then.  And in all those

5     cases you've looked at, you had a record that was vastly

6     different than here in that there was a damage being asserted

7     and there was evidence in the record of what that damage amount

8     was and how it can be calculated.

9          Your Honor, based on your rulings and how you have looked

10    at these issues following *Comcast*, I find it very hard to

11    believe that there's a parting of the ways in our minds because

12    all we're saying, Your Honor, is that they haven't made the

13    first step to show that here's the damage, here's how we

14    calculate it.  And their expert himself said I wouldn't be able

15    to sit here and opine that we should apply either one of these

16    methods if I wasn't able to show that there was at least a

17    change in price.

18         And based on his testimony now, he has not been able to

19    testify and not provided any evidence that there was a change

20    in price based on the removal of the flammability warning.

21         So I don't think there's a parting of the ways at all,

22    Your Honor.  I think we're directly in agreement.  That's why

23    you didn't certify the -- the California class.  That's why you

24    asked for expert testimony.

25         And I believe, Your Honor -- I'm not clairvoyant, but I

1   don't believe that this is what you expected when you thought

2   the expert would testify.

3        Thank you, Your Honor.  And I'll leave it to Ms. Murray on

4   whatever date the Court sets.

5              THE COURT:  Okay.  Thank you.

6        Yes?

7              MS. TERSIGNI:  I'll be brief, Your Honor.

8              THE COURT:  That's fine.  Take as long as you want,

9   Ms. Tersigni.

10              MS. TERSIGNI:  Okay.  The record -- the record on

11   this class certification motion and in open court today

12   establishes that Dr. Misra is qualified in this field to -- to

13   not only determine whether the methods -- there are two methods

14   that exist to ascribe -- to determine -- to determine the true

15   market value of Serum with or without the flammability warning

16   and to also -- to determine that whether those methods exist

17   and to actually run the methods.

18        L'Oreal's experts agree that the methods that he has --

19   that Dr. Misra has proposed are generally accepted in the

20   community and that they are sound methods, that they're

21   reliable.  The disagreement is whether they can actually be

22   used to quantify, to isolate the flammability warning effective

23   the removal of the flammability warning.  That's -- that's

24   basically a battle-of-the-experts question.  It doesn't really

25   have to go -- one expert is saying that it can be done, one

1   expert is saying that it cannot be done.  That's not -- that

2   doesn't go -- that does not satisfy a *Daubert* challenge or

3   Rule 702 challenge.

4       Two, *Comcast* does not require plaintiffs on a class

5   certification motion to calculate damages.  That would be -- if

6   we were -- if the -- if the models were to be run at this

7   stage, that would be tantamount to what we'd do at trial.

8       So I -- and there's nothing in *Comcast* that says that

9   that's required, just that you can -- that plaintiffs can

10  actually propose a class-wide method that is tethered to the

11  theory of liability.  And here, it's tethered to the theory of

12  liability because it spells out exactly how to determine the

13  true market value of Serum with or without a flammability

14  warning.

15      And two, the cases that oppose *Comcast* in these types of

16  mislabeling cases, particularly in the food products industry,

17  have -- we've cited in our briefs and we'll submit several more

18  cases -- have basically come -- you know, basically held that

19  plaintiffs -- all the plaintiffs have to do is propose a

20  workable model, not -- it's not whether the model actually

21  works.  It must be workable.

22      And even in the *In Re: POM* case where the -- where class

23  certification -- the class was decertified, the Court said

24  plaintiff must present a likely method for determining class

25  damages.  It's not necessary to show that the method will work

1    with certainty at this time.

2        So those cases are basically saying you don't have to run

3    the model.  And in those -- and in those cases, the plaintiffs

4    didn't actually run the model.

5            THE COURT:  I'm not sure that you do have to run the

6    model.  I think you may be correct about that.  My question,

7    though, as I indicated is:  If he doesn't have -- he thinks

8    data exists.  But if it turns out it doesn't exist, doesn't he

9    at least have to verify that the data exists before he can

10   employ the model that depends upon having that data available?

11           MS. TERSIGNI:  Yes.  He -- he -- the -- the

12   information -- in order to -- in order to run the RCDE model,

13   we'd need to obtain the information that the expert needs from

14   the model.  That said, there -- and he also testified that he

15   believes that that data exists and that there are ways to

16   obtain the data.

17       So -- discovery has not closed in this case, and we could

18   still obtain the data and run the model.

19       If that -- it's determined that that data is not

20   available, we still have the conjoint analysis, which is

21   perfectly fine and used in other cases.  So basically -- um,

22   that's all.  That's all.

23           THE COURT:  Okay.  I got it.

24       All right.  The proposed date for the hearing on class

25   certification is July 24, 2014, at 10:00 a.m.  Does that work?

1          MR. ELLIS:  As I indicated, I will not be able to be

2    here.  But as long as I'm excused, my counsel --

3          THE COURT:  You are excused.  And I think you very

4    clearly stated your position today, and I understand it.

5    Obviously, I'm sure co-counsel will also be able to respond.

6          MR. ELLIS:  Thank you, Your Honor.

7          THE COURT:  Thanks.

8       Okay.  Everyone, thank you very much.  Thank you very

9    much, Professor Misra, for coming today.  I realize you have

10   better things to do and higher and better use of your time, but

11   we appreciate you taking the time to come.

12         THE WITNESS:  Thank you.

13         THE COURT:  And to all the other experts who I did

14   not permit to testify.  Okay.

15         THE COURTROOM DEPUTY:  Court is adjourned.

16         (Proceedings concluded at 12:07 p.m.)

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

**CERTIFICATE OF OFFICIAL REPORTER**

COUNTY OF LOS ANGELES   )
                        )
STATE OF CALIFORNIA     )


        I, MYRA L. PONCE, FEDERAL OFFICIAL REALTIME COURT

REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE

CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT

TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING

IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY

REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT

THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE

REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.




                    DATED THIS 29TH DAY OF JUNE, 2014.



                    /S/ MYRA L. PONCE
                    _____
                    MYRA L. PONCE, CSR NO. 11544, RMR, CRR
                    FEDERAL OFFICIAL COURT REPORTER




**UNITED STATES DISTRICT COURT**